Filed 7/11/14  In re Leo C. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re LEO C., a Person Coming Under the Juvenile Court Law. | H040231 (Monterey County Super. Ct. No. J46674) |
| MONTEREY COUNTY DEPARTMENT OF SOCIAL & EMPLOYMENT SERVICES, Plaintiff and Respondent, v. L.C., Defendant and Appellant. | |

Leo C. (age five; the minor) and his two older half brothers, B.R. and A.R., were placed in protective custody in August 2012 after their parents' arrest.  The Monterey County Department of Social and Employment Services (Department) filed a petition alleging the failure of the minor's mother, C.C. (Mother), and the minor's father, L.C. (Father), to protect and provide support for the minor, under Welfare and Institutions Code section 300, subdivisions (b) and (g).[1]  It was alleged in the petition, among other things, that (1) the family was homeless and had been living in hotels; (2) Mother and Father were arrested by Salinas police officers on August 14, 2012, and were charged

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

with child endangerment, robbery, and possession of drug paraphernalia; (3) Mother and Father had been engaged in a criminal scheme in which Mother solicited men to have sex with her for money, and after she lured them to a motel room, Father entered the room and robbed the men by brandishing a fake gun; and (4) when the last such robbery occurred and Mother and Father were arrested, the minor was in Father's car (where drug paraphernalia was found within reach) and the minor's half brothers were in the motel room. Mother and Father were both incarcerated from August to December 2012.

In October 2012, the juvenile court found the allegations in the petition true, sustained the petition, and ordered the Department to provide family reunification services to Mother and Father. At the six-month review hearing in March 2013, the court continued those services. At that hearing, the Department indicated it was likely that Mother and Father would reunify with the minor if they were granted an additional six months of services. But in October 2013, at the 12-month permanency hearing, the court—pursuant to the Department's recommendation—terminated Father's reunification services, while allowing Mother to continue to receive services.

Father appeals from the order terminating his reunification services. He challenges the court's finding that reasonable services had been provided or offered by the Department. He argues that in March 2013, in compliance with his case plan, he submitted to a family assessment evaluation conducted by psychologist Marni Sandoval, Psy.D., of the Monterey County Department of Public Health. Dr. Sandoval concluded that, because of the complexity of Father's residual symptoms resulting from a catastrophic childhood accident, he "should be referred for a comprehensive medical and [neuropsychological] assessment to determine the full extent of his cognitive functioning and determine what accommodations or additional medical or mental health services [Father] might need in order to benefit from reunification services and obtain the skills to successfully reunify with his children." Dr. Sandoval also recommended a court-ordered

2

psychological assessment "to attempt to differentiate potential malingering from cognitive impairment." Despite the recommendations in Dr. Sandoval's court-ordered report, no further assessments were ever arranged or offered by the Department. Father contends the Department did not meet its burden of showing by clear and convincing evidence that it had provided reasonable reunification services to him.

We conclude that the court erred in terminating Father's reunification services at the 12-month permanency hearing. When the Department received Dr. Sandoval's report in March 2013, it was aware that Father's physical condition, including potential cognitive limitations, required further assessment to determine whether specialized measures were necessary to give him the skills necessary to benefit from reunification services. But the Department took no action in response to Dr. Sandoval's recommendations. Therefore, under the unique factual and procedural circumstances presented here, we conclude that the record does not contain substantial evidence to support the trial court's finding by clear and convincing evidence that the Department provided reasonable reunification services to Father. Accordingly, we will reverse the court's order to the extent it terminated Father's reunification services based upon that finding.

## FACTS AND PROCEDURAL HISTORY

I. *Initial August 2012 Petition and Detention Order*

On August 16, 2012, the Department filed a petition alleging that the minor's parents had failed to protect the minor and had left him without any provision for support. (§ 300, subds. (b) and (g), respectively.) It was indicated in the petition that "[c]ourt intervention, supervision and out-of-home placement are necessary to ensure the safety and protection of the children due to the parents' criminal activities and incarceration, drug use, domestic violence and neglect of the children."

The Department alleged,[2] among other things, that (1) Mother has three children, B.R. (age 10), A.R. (age 8), and the minor (age 5); (2) A.R., Sr. (hereafter, A.R.S.) is the father of B.R. and A.R.; (3) L.C. is the Father of the minor; (4) Mother, Father, and the three children reside together, but the family is homeless and have been living in various Monterey County hotels; (5) there had been three referrals to the Department since 2009 alleging physical abuse and neglect of the children and two of the referrals had been determined to be unfounded; (6) the Department was contacted by the Salinas Police Department on August 14, 2012, because both of the minor's parents were arrested; (7) the parents were charged with child endangerment, among other charges; (8) police officers indicated that Mother had solicited men to have sex with her for money, Father stayed in his car with the children and followed Mother and the victims to a motel room, and then Father went to the room (leaving the children in the car), threatened the men with a fake gun, robbed them, and then sent them away; (9) at the time of the last robbery, the minor was in Father's car (where a methamphetamine pipe was found within easy reach of the minor) and his half brothers were in the motel room; (10) the motel room rented by the family was filthy, with food and clothing strewn about, and with hypodermic needles and other drug paraphernalia within the children's reach; and (11) Mother had an outstanding arrest warrant and Father was on probation. The police indicated there had been a great deal of contact with both parents over the previous six months; Father was a methamphetamine user; and Mother was believed to have been using drugs.

The minor's half brothers, B.R. and A.R, indicated that they had not seen their biological father, A.R.S., since they were very young. They "were guarded with the

---

[2] The statements made in this paragraph and the succeeding two paragraphs are based upon the allegations made by the Department in its petition. For simplicity and to avoid repetition, we have generally omitted the phrase "The Department alleges in its petition" in describing those allegations.

social worker and would not say anything about their [parents'] activities. They denied seeing drugs or anything bad involving their [M]other and [Father]." The social worker observed that the minor had "a very pronounced speech impediment and [did] not speak in complete sentences; however, he did say, '[T]he cops stopped the car, cops told mom and dad put hands up like this' (he put his hands up in the air)."

The social worker was unable to interview Father in the Monterey County jail because he was uncooperative and was being held in a secured cell. Mother was interviewed at the Monterey County jail and told the social worker that she and Father had used the scheme to rob men after she solicited them for sex approximately six times. They would leave the three children unattended while committing these criminal acts. Mother told the social worker that she had been repeatedly beaten over an extended period of time by Father, and he had burned her with lighted cigarettes. She showed the social worker circular marks on her body evidencing these burns. Mother said that on at least one occasion, Father choked her in the presence of the children and they had "yelled at him to stop because she was not breathing." When she had threatened to leave him, Father told her he would beat her if she left. She stated further that she had solicited the victims who were robbed by Father because he had threatened to beat her if she refused to comply. Mother indicated that the minor was not current with his immunizations. She also admitted she used methamphetamine.

On August 17, 2012, the court ordered the minor detained pursuant to section 319, subdivision (b). Mother and Father both attended the hearing.

II.    *Report and Jurisdictional and Dispositional Hearing*

In its September 28, 2012 jurisdiction/disposition report, the Department repeated the allegations concerning the parents in the initial petition. It was reported that both parents were still in custody. The social worker reported that Mother had "a criminal history, including convictions for theft, engaging in [a] speed contest, and traffic

5

infractions." The social worker also reported that Father had "an extensive criminal history, including convictions for battery, possession of marijuana, theft, engaging in [a] speed contest, and traffic infractions."

The Department indicated that all three children had been placed with a Monterey County foster family on August 15, 2012. The social worker noted that Mother had "already established a relationship with the foster parent, via letters. [Mother] has expressed sincere gratitude to [them] via the social worker and letters addressed to the foster parent. . . . [Mother] is also supportive of the children's preference in regards to where they are placed." The Department recommended that family reunification services be provided to Mother, Father, and A.R.S., the presumed father of B.R. and A.R.

On October 3, 2012, after a jurisdictional and dispositional hearing attended by Mother and Father, the court found the allegations in the petition true and sustained the petition. The court declared the minor a dependent child of the juvenile court. It ordered (1) the minor to be removed from the physical custody of Mother and Father; (2) that the Department be responsible for planning, placement, supervision and maintenance of the minor; (3) family reunification services be provided to Mother and Father; (4) that the case plan proposed by the Department be adopted, with all parties ordered to comply with that plan; (5) that October 2, 2013 was the likely permanency date; and (6) that March 27, 2013, was the date for the six-month review hearing.[3]

III.    *Six-Month Review Hearing and Order*

The Department submitted a status report in March 2013 in anticipation of the six-month review hearing. It reported that Mother had been convicted of robbery (Pen.

_____

[3] The record reflects that the court also found the minor's older half brothers, B.R. and A.R., dependent children of the court. It ordered them to be physically removed from the physical custody of Mother and Father; that they not be placed with the noncustodial father, A.R.S.; and that the Department be responsible for their planning, placement, supervision and maintenance. The order also reflects that B.R., A.R., and the minor were placed in the same foster home.

6

Code, § 211), three counts of causing great bodily harm to a child (Pen. Code, § 273a, subd. (a)), possession of controlled substance paraphernalia (Health & Saf. Code, § 11364.1, subd. (a)), and grand theft from a person to another (Pen. Code, § 487, subd. (c)). Mother was released from county jail on December 14, 2012, and was placed on formal probation for three years. The Department also reported that in August 2012, Father was convicted of robbery (Pen. Code, § 211), three counts of causing great bodily harm to a child (Pen. Code, § 273a, subd. (a)), possession of controlled substance paraphernalia (Health & Saf. Code, § 11364.1, subd. (a)), driving on a suspended or revoked license (Veh. Code, § 14601.1, subd. (a)), and grand theft from a person to another (Pen. Code, § 487, subd. (c)). He was released from county jail on December 14, 2012, and placed on formal probation for three years. On January 25, 2013, Father was sentenced at a court hearing to serve 365 days in county jail, commencing February 5, 2013.[4] He had applied for home confinement, but based upon the projected fees involved, Father decided to serve the jail time instead.

While incarcerated, Mother completed a parenting workbook the Department had provided and had participated in 12-Step meetings. She began participation in the Sun Street Center outpatient program in January 2013, attending semiweekly meetings. The social worker reported that Mother had remained clean and sober for approximately six months as demonstrated by negative drug tests; was attending Narcotics Anonymous (NA) meetings at least five times per week and Alcoholics Anonymous (AA) meetings on weekends; had met with her sponsor for the first time in February 2013 and was intending to "soon begin the step work"; and was to commence attending a Triple P

_____

[4] The status report indicates that the hearing at which this sentence was imposed was "in regards to the current charges." Since it appears Father had previously received three years' probation after being convicted of the seven offenses charged after his arrest in August 2012, the meaning of the Department's reference to "the current charges" for which Father received a 365-day jail sentence is unclear.

7

parent education course through Community Human Services in Salinas starting March 1, 2013. The Department indicated that Mother stated appropriate concern for her three children's welfare and was observed being affectionate towards them; but "she struggles with including and engaging all three children during her scheduled visitations."

Father had also participated in 12-Step meetings during his incarceration. Like Mother, he had remained clean and sober for approximately six months as evidenced by negative drug testing. But due to Father's incarceration, it was necessary that a new referral be completed for an alcohol and drug assessment. A referral was completed and Father was contacted by voice mail, but he had not called to schedule an appointment. The Department reported that since his release from jail, Father had been attending NA meetings at least five times per week since January 2013, and had attended AA meetings on weekends. But he had not obtained a sponsor and therefore had not started step work. Father was to commence attending a Triple P parent education course starting March 1, 2013. The social worker noted that Father was affectionate towards the minor during visitation. "Although he is not the biological father of [B.R.] and [A.R.,] he refers to them as his children. . . . However, . . . during scheduled visitations at the Department, . . . his attention is focused solely on [the minor. Father] becomes overwhelmed with emotions and gives the [minor] long hugs, which makes it difficult for [the minor] who is having difficulty understanding the process."

The case worker reported that Mother and Father were renting a room in Salinas from a family friend. Neither Father nor Mother was employed, although both had been consistently looking for work.

The Department concluded that "[t]he parents struggle with the circumstances that have brought them before the Court . . . [and both of their families have] a long-standing generational pattern of poverty, substance abuse, domestic violence, and criminal behavior. There are concerns regarding the parents' ability to understand the emotional

8

impact their choices have had on their children." The Department indicated that the parents' drug dependency, mental health issues, and domestic violence history remained unresolved and there was continued concern about their parenting skills and ability to meet the basic needs of the minor and his two half brothers. Mother and Father both acknowledged that they were not currently ready to parent the children.

The Department recommended that the minor and his two half brothers continue to be placed with the foster family with whom they had been living since August 2012. It also recommended that family reunification services be continued for Mother and Father, explaining: "While [Mother] and [Father] have shown encouraging effort and investment during the current review period, the brevity of their current success clearly indicates the need for further assessment and ongoing provision of corrective services. However, if granted an additional six months of family reunification services, it is likely that [Mother] and [Father] will reunify with the children."[5]

Pursuant to section 366.21(e), a six-month review hearing took place on March 27, 2013. The Department, the minor and his half brothers, Mother, and Father were all represented by counsel, and Mother and Father were also present.[6] The court received the Department's report into evidence. The court adopted the proposed findings, including the finding that Mother's and Father's progress toward alleviating or mitigating the causes that had necessitated placing the minor in a foster home had been minimal. It ordered that the minor and his half brothers continue as dependents of the court; Mother, Father, and A.R.S. continue to receive reunification services; and Mother and Father have

_____

[5] The Department also recommended that reunification services be continued for A.R.S., the father of the minor's half brothers, B.R. and A.R., although it also indicated that A.R.S.'s prospects of future successful reunification were poor.

[6] It was noted that Father was in custody as of the date of the six-month review hearing. Additionally, although the clerk's minutes do not reflect that Father appeared at the hearing, the reporter's transcript reflects that the court addressed Father directly and he responded to its questions.

visitation rights in accordance with their case plans. The court set a 12-month review hearing for October 2, 2013.[7]

IV. *Twelve-Month Permanency Hearing and Order*

A. *The Report*

The Department filed a status report on September 11, 2013, for the 12-month permanency hearing scheduled for October 2, 2013. It was noted in the report that the minor and his two half brothers were living with the foster family with whom they had been placed in August 2012.

In July 2013, Mother had moved to a transitional housing facility. By August 2013, she had retained employment as a customer service associate in a retail store, a job to which she was reportedly "adjusting well." Mother had been in compliance with the terms of her probation. In addition, she had obtained a restraining order to protect herself from further domestic violence from Father and had begun the process of obtaining a divorce from him.

The Department noted that Mother had remained clean and sober for 12 months, as shown by negative drug test results, and had continued to regularly attend AA and NA meetings. She had met weekly with her sponsor, was working on the 12-Step program, and had met weekly with her mentor. Mother had also been receiving therapy on a weekly basis since late June 2013. According to her therapist, Mother had "take[n] full responsibility for [the] drug and alcohol use that led to the children's removal." The social worker indicated that she had met with Mother's therapist "to discuss progress in therapy and it was clear that [Mother] is doing wonderful work in therapy."

---

[7] In making its findings and order, the court noted Father's objections to certain proposed findings and set the case for a status hearing to determine whether any of its findings, based upon Father's objections, should be modified. The record reflects that a status hearing occurred on April 17, 2013. The court did not modify any of its findings from the six-month review hearing.

Mother had attended and completed an eight week Triple P parenting course in which she learned basic parenting skills. The social worker reported that Mother had "taken recommendations to more appropriately engage all of her children" by altering the way she interacted with them during visits. Mother began visitation with her children on January 10, 2013, following her release from incarceration. The social worker opined that Mother had "demonstrated appropriate parenting and limit[-]setting with her children during visits . . . [as well as] relationship[-]building." Visitation had increased in August 2013 to visits twice per week, for a total of four hours weekly. "The boys expressed they are enjoying more time with their mother." The social worker reported that there had been some behavioral concerns involving A.R., but she suggested that they might be attributable to recent adjustments the children had had to make with Father's release from custody and learning that Mother and Father were no longer together. The Department indicated that Mother had "made significant case plan progress during the last review period and it is likely that should she continue to do well, [she] will reunify with her children if the Court grants additional family reunification services." It therefore recommended that the minor and his half brothers continue in the care of their foster family, and that family reunification services be continued for Mother.

The Department reported that Father, after being incarcerated from August 14 to December 14, 2012, had served a further jail sentence from March 22 to July 15, 2013.[8] After his release, Father began a 12-month residential drug treatment program with the Jericho Project in the Bay Area, but chose to leave the program a few weeks later. He returned to Monterey County and was living at Turning Point in Salinas. On August 22, 2013, he had obtained employment with a fish packing plant in Salinas where he worked 12-hour days.

_____

[8] The record is silent as to the criminal conviction (or probation revocation) that was the basis for Father's further confinement between March and July 2013. (See fn. 4, *ante*.)

Father had signed up for the Triple P parenting program in March 2013, but had not attended the course because of his incarceration, which began on March 22, 2013. He had participated in 12-Step meetings while incarcerated and had remained clean and sober for six months, as evidenced by negative drug tests while working with a prior social worker. Before his second incarceration, Father had attended NA meetings at least five times per week. After his release in July 2013, and after leaving the Jericho Project, Father had not enrolled in another program to address his substance abuse problem, and had not been attending either NA or AA meetings. He stated to the social worker in August 2013 that "he no longer wanted to attend meetings or work his case plan." When Father learned that Mother had left him and was seeking a divorce, he told the social worker "he wanted to relinquish his parental rights to the foster parents."

The social worker reported that Father had participated in a family mental health assessment with Dr. Sandoval on March 7, 2013, but that he had "[t]o date, . . . not showed a willingness to participate in the recommendations made through his assessment . . . [and] upon his release from jail, . . . [had] still not been in contact with any mental health services. It was recommended that [Father] participate in a psychological evaluation. However, due to incarceration, [Father] was not able to participate."[9]

Father visited the minor, B.R., and A.R. between January and March 2013, but his visits ceased when he returned to custody on March 22, 2013. After Father's release and return to Salinas, he contacted the Department and requested visits. The social worker reported that "[h]e was very rude, impatient, and demanding while [she] was working with many schedules to get the visits implemented. Prior to his request for visits, he had only one or two contacts with the social worker, despite being told that he needed to call immediately upon his release to discuss visitation and his case plan."

_____

[9] The assessment of Father performed by Dr. Sandoval is discussed in detail, *post*.

12

Father visited the minor and his half brothers on August 28, 2013. The social worker indicated that weekly supervised visits were appropriate because all three boys expressed a desire to visit with Father. Under the heading of the Department's report captioned "Family's Perception of their Needs" (capitalization and underscoring omitted), the social worker noted: "Re: [Father]: 'I am fine with you recommending terminating my FR services. I just want to have some visitation with my kids.'"

The Department summarized that there was a concern about Father's parenting ability, and that he continues to "struggle[] with the circumstances that have brought him before the court, as evidenced by him not being able to articulate why [the minor] and the other children were removed." "[His] mental health and domestic violence history remain unresolved," and he had not enrolled in an appropriate program to deal with his substance abuse problems. The Department acknowledged that Father had been incarcerated for most of the review period, but noted that, notwithstanding the social worker's having emphasized to him the importance of communicating with her immediately upon his release, "he has not been focused on his case plan and has not kept good communication." Based upon its conclusion that there was not a substantial probability that the minor would be returned to Father and safely maintained in the home within the time permitted by law if an additional six months of services were granted, the Department recommended termination of family reunification services.[10]

---

[10] The Department also indicated that A.R.S., the father of the minor's two half brothers, had not established a relationship with his sons and had not maintained good communication with the Department. In addition, A.R.S. had not seen his sons since they were toddlers. Although he indicated he would like to establish visitation with them, they had indicated they were not ready to visit with him; A.R.S. told the social worker he respected those wishes. For this reason, the Department also recommended termination of family reunification services for A.R.S.

13

B.     *Twelve-Month Permanency Hearing and Order*

The 12-month permanency hearing took place on October 2, 2013.  The court considered and received into evidence the Department's status report, a transfer of therapy report concerning the minor, a treatment and progress report and a family mental health assessment addendum both filed September 9, 2013, and a family health assessment addendum filed April 8, 2013.  No testimony or other evidence was presented at the hearing.

Father, through counsel, objected to the Department's recommendation that his services be terminated, including the recommended finding that adequate services had been provided to him.  Father's counsel argued that the Department should arrange for a psychological evaluation and a neuropsychological examination because they had been previously recommended in the family assessment report.[11]  Counsel for the Department responded that the reason Father had not done well with reunification efforts was due to his being in custody, rather than because of any neurological deficits.  She asserted that while Father could pursue neurological or psychological treatment on his own, "the [D]epartment [does not have] a responsibility at this stage to be providing an assessment."

The court agreed with the Department.  It reasoned:  "Psychological evaluations to determine whether someone is capable of profiting from services where it appears that they are not, and [the court does not] see the need to conduct the examination."  After further argument, the court rejected the contention of Father's counsel that Father had the

---

[11] Father's counsel argued:  "I'm going to ask for a [neuropsychological] exam for [Father].  He suffered a traumatic injury as a youngster and the family assessment recommends a psychological evaluation and a [neuropsychological] exam. . . . I think one reason he's not been able to participate in services is because of his neurological deficits.  And in order to clear that up, I know we're at the 12 month point and that's my responsibility.  I should have picked up on that particular issue earlier, but the family assessment does point it out specifically that it is a recommendation."

14

right to have the court "look into a neuropsychological aspect of the injuries he did sustain." The court stated: "He does not have that right. We conduct examinations, psychological primarily. [The court is] not aware of any [neurological] exam that's been ordered as part of the dependency process. . . . [T]his does not appear to be a case where that information would be relevant to the inquiry that has already been made into the question of whether [Father] can participate in and benefit from services to the point where he has become . . . [¶] . . . [I]t is not something that the [D]epartment or the Court is in any way mandated to pay for and provide at this point."

The court adopted the findings and orders as recommended by the Department. Included among the court's findings were that (1) reasonable services had been offered to the parents to overcome the problems that led to the minor's initial removal; (2) the Department had complied fully with the case plan by making reasonable efforts to return the minor to a safe home; (3) Father had failed to participate regularly in court-ordered treatment programs; (4) Father's progress toward alleviating or mitigating the causes that had necessitated the placement of the minor in foster care had been minimal; (5) return of the minor to the parents would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the minor; and (6) by clear and convincing evidence, there was not a substantial probability that the minor would be returned to the physical custody of Father and safely maintained in the home before the 18-month permanency review hearing. The court ordered that the minor continue as a dependent in out-of-home custody. It ordered that family reunification services be continued for Mother, but terminated as to Father and A.R.S. The court also ordered that Father have reasonable visitation of the minor and his half brothers in accordance with the case plan. It set an 18-month permanency review hearing for February 19, 2014.

15

DISCUSSION

I.      *Applicable Legal Principles*

A.      *Dependency Law Generally*

Section 300 et seq. provides "a comprehensive statutory scheme establishing procedures for the juvenile court to follow when and after a child is removed from the home for the child's welfare.  [Citations.]"  (*In re Celine R.* (2003) 31 Cal.4th 45, 52.)  As our high court has explained, "The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.  [Citations.]  Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect.  [Citations.]  The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful.  [Citations.]  This interest is a compelling one.  [Citation.]"  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

The court at the jurisdictional hearing must first determine whether the child, by a preponderance of the evidence, is a person described under section 300 as coming within the court's jurisdiction.  (§ 355, subd. (a).)  Once such a finding has been made, the court, at a dispositional hearing, must hear evidence to decide the child's disposition, i.e., whether he or she will remain in, or be removed from, the home, and the nature and extent of any limitations that will be placed upon the parents' control over the child, including educational or developmental decisions.  (§ 361, subd. (a).)  If at the dispositional hearing, the court determines that removal of the child from the custody of the parent or guardian is appropriate, such removal order must be based upon clear and

16

convincing evidence establishing that one of five statutory circumstances exists. (§ 361, subd. (c).) One such circumstance is the existence of substantial danger to the dependent child's "physical health, safety, protection, or physical or emotional well-being" were he or she returned to the home. (§ 361, subd. (c)(1).)

After it has been adjudicated that a child is a dependent of the juvenile court, the exclusive procedure for establishing the permanent plan for the child is the permanency hearing as provided under section 366.26. The essential purpose of the hearing is for the court "to provide stable, permanent homes for these children." (§ 366.26, subd. (b); see *In re Jose V.* (1996) 50 Cal.App.4th 1792, 1797.)

Prior to the permanency hearing, there are periodic status reviews as ordered by the court, but not less frequently than every six months. (§ 366, subd. (a)(1).) "At the review hearing held six months after the initial dispositional hearing [the six-month review hearing], the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e).) The identical standard applies at the 12-month permanency hearing. (§ 366.21, subd. (f).) "Review hearings are critical because they are the point at which a parent may be denied further reunification services. [Citation.]" (*In re Jesse W.* (2007) 157 Cal.App.4th 49, 61; see also *In re Derrick S.* (2007) 156 Cal.App.4th 436, 450 [reunification is "standard topic at" six-month review hearings].)

### B. *Family Reunification Services*

When the dependent child is removed from parental custody, the juvenile court is ordinarily required to provide the parent with services to facilitate the reunification of the family. (§ 361.5, subd. (a); see *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285,

17

303.)[12]  As explained by one court:  "The importance of reunification services in the dependency system cannot be gainsaid.  The law favors reunification whenever possible.  [Citation.]  To achieve that goal, ordinarily a parent must be granted reasonable reunification services.  [Citation.]  But reunification services constitute a benefit; there is no constitutional ' "entitlement" ' to those services.  [Citation.]"  (*In re Aryanna C.* (2005) 132 Cal.App.4th 1234, 1242.)[13]

The statutory time period for reunification services ordered in the case of a child three years of age or older (as is the case here) is a period from the date services are ordered at "the dispositional hearing and ending 12 months after the date the child enters foster care . . . unless the child is returned to the home of the parent or guardian."  (§ 361.5, subd. (a)(1)(A).)  Notwithstanding this time limit, the court may extend services to 18 months from the date the child was initially removed from the home if it is shown that the permanent plan of returning the child to the parent with the child being safely maintained in the home can be achieved within the extended period.  (§ 361.5, subd. (a)(3).)  Although a parent may reasonably expect under most circumstances to receive reunification services for at least the periods designated under section 361.5, subdivision (a)(1), there is no entitlement to services for a prescribed minimum period.  (*In re Derrick S.*, *supra*, 156 Cal.App.4th at pp. 445-450 [parent of child over three not entitled to

---

[12] "Except as provided in subdivision (b), . . . whenever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians . . . ."  (§ 361.5, subd. (a).)

[13] A court may order that reunification services be bypassed altogether if one of sixteen circumstances is established by clear and convincing evidence, as specified in subdivision (b) of section 361.5.  One such circumstance is where the court finds that "the parent or guardian is suffering from a mental disability that . . . renders him or her incapable of utilizing those services."  (§ 361.5, subd. (b)(2); see *In re Ethan C.* (2012) 54 Cal.4th 610, 626.)  The Department did not seek a bypass of reunification services in this case.

18

minimum of 12 months of services]; *In re Aryanna C.*, *supra*, 132 Cal.App.4th at pp. 1242-1243 [parent of child under three not entitled to minimum of six months of services].) Thus, "the juvenile court has the discretion to terminate the reunification services of a parent at any time after it has ordered them, depending on the circumstances presented." (*In re Aryanna C.*, at p. 1242.)

The services offered by the agency must be "reasonable 'under the circumstances.' Such circumstances necessarily include the mental condition of the parent, her [or his] insight into the family's problems, and her [or his] willingness to accept and participate in appropriate services." (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.) Under section 361.5, the agency is required to make " '[a] good faith effort' to provide reasonable services responding to the unique needs of each family. [Citation.]" (*In re Monica C.* (1995) 31 Cal.App.4th 296, 306.)

In cases in which the agency establishes by clear and convincing evidence that the parent suffers from a disability that precludes him or her from utilizing reunification services, such services need not be ordered. (§ 361.5, subd. (b)(2).) But if services are ordered and the parent suffers from mental health issues, reunification services must be individually tailored to address those issues. (Seiser & Kumli on Cal. Juvenile Courts Practice and Procedure (Matthew Bender 2014) § 2.129[14], p. 2-461 (Seiser & Kumli).) "Family reunification efforts must be tailored to fit the unique challenges suffered by individual families unless a Welfare and Institutions Code section 361.5 disability is proven by clear and convincing evidence. In other words, the juvenile dependency system is mandated by law to accommodate the special needs of disabled and incarcerated parents." (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1792.) Once the agency has individually tailored the case plan to provide services addressing a disabled parent's needs, the parent is not excused from participating in the plan because of his or her disability. (*In re Christina L.*, *supra*, 3 Cal.App.4th at p. 415.)

19

For incarcerated parents receiving reunification services, social services agencies have a duty to ascertain what services may be available in the institution; agencies may not shirk that responsibility by requiring incarcerated parents to investigate and determine what services may be available. (*In re Monica C.*, *supra*, 31 Cal.App.4th at pp. 307-308; see also *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1013 [reasonable services not provided to incarcerated parent where agency did not contact institution to inquire about available services].) Communication in implementing a case plan, even with incarcerated parents, is a two-way street. " 'While it is true the social worker is charged with maintaining reasonable contact with the parents during the course of the reunification plan,' it is also true that incarcerated and institutionalized parents (just as with all other parents) must do their part to stay in contact with the social worker [citation]." (Seiser & Kumli, *supra*, at § 2.129[5], p. 2-445, quoting *In re T.G.* (2010) 188 Cal.App.4th 687, 698.)

The court must assess at each review hearing whether the agency has provided reasonable reunification services. (§§ 366, subd. (a)(1)(B); 366.21, subds. (e) [six-month review hearing], (f) [12-month permanency hearing], § 366.22, subd. (a) [18-month review hearing].) At the six-month review hearing and 12-month permanency hearing, the agency has the burden of establishing by clear and convincing evidence that reasonable services have been provided to the parents. (Seiser & Kumli, *supra*, at § 2.152[4] [b], p. 2-490; see also *Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 74; *In re Monica C.*, *supra*, 31 Cal.App.4th at p. 306.) The standard consists of a showing of " '[a] good faith effort' to provide reasonable services responding to the unique needs of each family." (*In re Monica C.*, *supra*, 31 Cal.App.4th at p. 306.) The determination of whether reasonable services were provided depends on the circumstances of the individual case. "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were

20

imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

      C.     *Appellate Review of Orders Terminating Reunification Services*

In reviewing a trial court's assessment of the adequacy of a reunification plan and the reasonableness of an agency's efforts to provide services, the substantial evidence standard is applied. (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1428 (*Tracy J.*); *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1346 (*Amanda H.*).) "We review the evidence most favorably to the prevailing party and indulge in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.] ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citations.]' [Citation.] 'Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence. [Citations.]' [Citation.]" (*Tracy J.*, at p. 1424; see also *Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688-689.) Furthermore, " ' "[t]he sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal." [Citations.]' [Citation.]" (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881, quoting *Crail v. Blakely* (1973) 8 Cal.3d 744, 750.)

    II.    *Order After 12-Month Permanency Hearing*

      A.     *Background*

The focal point of Father's appellate challenge is that the Department failed to provide or facilitate the medical, neuropsychological, and psychological assessments

recommended by Dr. Sandoval. We will begin by considering in detail Dr. Sandoval's assessment and recommendations.

Both the original and the updated case plans—which plans were approved by the court in October 2012 and March 2013, respectively—called for Father to participate in a family assessment through the Children's Behavioral Health Department. Father participated in the family assessment process by submitting to a three-hour interview by Dr. Sandoval on March 7, 2013.[14] Dr. Sandoval's report to the Department concerning these family assessments, addressed to the Department's assigned social worker, was submitted March 21, 2013. The report, captioned "Family Mental Health Assessment—Addendum,"[15] was filed with the court on April 8, 2013.

Dr. Sandoval reported that Father "appeared anxious and rubbed his hands repeatedly on his thighs while talking. When discussing especially distressing events, such as the removal of his children, he became silent, withdrawn (and perhaps dissociative) and needed prompting in order to remain responsive." She explained that Father's "current and past functioning, including his capacity to parent, should be viewed in light of likely neurological deficits and brain injury" resulting from a catastrophic accident that occurred when he was five years old. At that time, he fell into a fiery barbecue pit, sustaining burns over fifty percent of his body. He also sustained blunt trauma brain injury during the accident. He was hospitalized for approximately one year. Father "reported that he suffered severe memory impairment and underwent significant rehabilitation, including re-learning how to talk." Dr. Sandoval, noting that Father's medical records had not been requested, opined that it was "likely [Father] suffered brain damage perhaps from swelling in response to the burn. Other common pediatric

---

[14] Mother was interviewed by Dr. Sandoval on March 20, 2013.

[15] There was a prior family health assessment report prepared and submitted by Dr. Sandoval in September 2012. Dr. Sandoval noted in her report that because Mother and Father were both incarcerated, they had not participated in the prior assessment.

neurological problems after severe burns include: toxic shock, disseminated intervascular coagulation . . ., severe dehydration, hemorrhaging and anemia. All of these problems result in permanent brain and central and peripheral nervous system damage that significantly affect[s] child development."

Dr. Sandoval noted that, according to Father, many of his problems, both past and current, were related to his childhood injury. "His inability to complete school (due to severe concentration difficulties), addiction to methamphetamine (a supposed self-treatment for memory and concentration deficit[s]) and later gang involvement (the only friends who would accept his arm disfigurement [were gang members]) are a few of the significant life events that he related to his injury." Dr. Sandoval noted that Father had been under psychiatric care between 2000 and 2009.[16] He told Dr. Sandoval that his greatest concerns were for his memory and cognitive functioning. Dr. Sandoval observed that Father's "short-term memory and comprehension appeared to be below average." Dr Sandoval observed that "[o]ver the course of the interview, it became apparent that although [Father's] cognitive abilities may have been impaired by the burn injury, he also cited his injury as a primary reason to avoid taking responsibility for his life." She also stated that "[Father's] apparent confusion about methamphetamine as a treatment for his neurological problems raised questions about whether he was malingering his cognitive symptoms beyond his actual impairment to avoid taking responsibility for his drug use and other problems."

---

**[16]** Dr. Sandoval noted that Father had reported that he had received treatment from Access Behavioral Health from 2000 to *2008* "for 'memory problems' related to his injury." Father told Dr. Sandoval that he had " 'lost' benefits in 2008 and with no where [*sic*] to turn for medication[,] he began to use methamphetamine 'to help [his] memory' and concentration." He continued to use methamphetamine until his arrest in August 2012. Dr. Sandoval indicated that a later review of Father's records disclosed that he had been under the care of a staff psychiatrist in Access Behavioral Health Care from 2000 to *2009*. He had not "lost" benefits; instead, he had stopped attending scheduled appointments for six months and his file was then closed.

Dr. Sandoval reported that Father's "assessment results should be viewed in light of his likely neurological deficits resulting from his burn injury. It is unclear to what extent potential brain injury impacted his parenting abilities and decision making leading up to the removal of his children and how these deficits may continue to impact his future abilities to parent. If indeed [Father] is suffering from neurological impairment that significantly affects his memory and cognitive functioning, he may not be expected to reasonably benefit from services without accommodation." She concluded that "[g]iven the potential neuropsychological problems, accurate psychological diagnosis cannot be made at this time without further in-depth assessment. [Father] should be referred for a comprehensive medical and neurological assessment to determine the full extent of his cognitive functioning and determine what accommodations or additional medical or mental health services [Father] might need in order to benefit from reunification services and obtain the skills to successfully reunify with his children." Besides a neuropsychological assessment, Dr. Sandoval also recommended that he participate in a court-ordered psychological assessment "to attempt to differentiate potential malingering from cognitive impairment."

Dr. Sandoval recommended that Father continue to participate in outpatient substance abuse treatment, and should attend a parent education group and domestic violence counseling. She indicated that after completion of the recommended psychological, neuropsychological, and medical assessments, Father's "treatment should be adjusted to accommodate his potential learning disabilities or cognitive delays." She concluded that "[a]n in[-]depth medical and neuropsychological assessment is beyond the scope and ability of Monterey County Children's Behavioral Health to provide; however, these evaluations will be critical in assisting the Department and the Court in determining next steps in [Father's] current Dependency Case for his children."

A second, lengthier family assessment report by Dr. Sandoval, dated June 24, 2013 (captioned "Family Mental Health Assessment and Recommendations Addendum"), was filed with the court on September 9, 2013. With respect to Father, Dr. Sandoval reiterated her recommendations for further medical, neuropsychological, and psychological assessments to "help determine what accommodations or additional medical or mental health services [Father] might need in order to benefit from services and obtain skills to successfully reunify with his children."

B.      *Contentions*

Father contends the record shows that as a result of his participation in a family mental health assessment, it was determined he should "undergo 1) a medical and neuropsychological examination and 2) a psychological evaluation in order to determine what accommodations [he] might need in order to comply with the case plan and fix the problems that led to the removal of his children." The Department did not refer Father for these additional examinations. Father contends that he therefore did not receive reasonable reunification services as required under section 361.21, subdivision (e), and the court erred in finding that the Department provided such services. He asserts further that the court erred by concluding that neither the Department nor the court had the obligation to pay for such examinations. Father argues that because there was no substantial evidence in support of the court's finding that the Department provided him with reasonable family reunification services, its order terminating such services must be reversed.

C.      *No Substantial Evidence Supports Court's Finding*

As noted above, "Family reunification efforts must be tailored to fit the unique challenges suffered by individual families . . . [T]he juvenile dependency system is mandated by law to accommodate the special needs of disabled and incarcerated parents." (*In re Elizabeth R.*, *supra*, 35 Cal.App.4th at p. 1792.) Thus, the Department,

25

in providing reasonable services, was required to evaluate Mother and Father to determine whether either of them had any special needs to address in their attempts to reunify successfully with their children. The Department commenced this task by requiring that the parents, as part of their case plan, to attend a family assessment appointment through the Children's Behavioral Health Department. Mother and Father both complied with this case plan requirement after their respective releases from jail in December 2012.

Dr. Sandoval in her assessment of Father concluded that as a result of his catastrophic childhood accident, he had potentially significant cognitive limitations, including limitations on short-term memory and concentration. These limitations, coupled with his history of drug abuse and his lengthy history of psychiatric care, caused Dr. Sandoval to express uncertainty as "to what extent potential brain injury impacted [Father's] parenting abilities and decision making leading up to the removal of his children and how these deficits may continue to impact his future abilities to parent." Because the complexity of Father's potential medical and psychological issues were beyond the scope of the services Monterey County Children's Behavioral Health were able to provide, Dr. Sandoval recommended that Father be referred for a comprehensive medical and neurological assessment. The purpose for this comprehensive assessment was "to determine the full extent of [Father's] cognitive functioning and determine what accommodations or additional medical or mental health services [he] might need in order to benefit from reunification services and obtain the skills to successfully reunify with his children." She also recommended a psychological assessment of Father to sort out potential malingering from cognitive impairment.

Thus, in this instance, "the unique needs of [the] family" (*In re Monica C.*, *supra*, 31 Cal.App.4th at p. 306) required the Department, in furnishing reasonable services, to consider the significant possibility that Father had medical, psychological, and/or

26

cognitive issues impacting his ability to successfully reunify with the minor. But there is no evidence in the record that the Department took any steps to obtain referrals for "a comprehensive medical and neuropsychological assessment" or a psychological assessment of Father, as recommended in the two family assessment reports. There is no documentary evidence of any such referrals, and there was no evidence presented at the 12-month permanency hearing that the Department took any action in response to Dr. Sandoval's recommendations.[17] Similarly, there is nothing indicating that Father or his counsel requested referrals for such assessments prior to counsel addressing the issue at the October 2013 12-month permanency hearing.

*Tracy J.*, *supra*, 202 Cal.App.4th 1415, is instructive. There, developmentally disabled parents challenged the juvenile court's orders at the 18-month review hearing in which the court terminated the parents' reunification services and set a hearing under section 366.26. (*Tracy J.*, at pp. 1419, 1422-1423.) The father had suffered a head injury as a child and had "tested in the lower range of mildly mentally retarded." (*Id.* at p. 1420.) The mother had a variety of significant physical problems that impacted her ability to provide everyday care to her child (*id.* at pp. 1419-1420), and she "tested in the borderline range of intellectual functioning." (*Id.* at p. 1420.) She had indicated that she suffered from a genetic disorder, Prader-Willi syndrome, which "results in a variety of physical and behavioral characteristics, including obesity, health problems related to obesity and mild to moderate cognitive impairment. [Citation.]" (*Id.* at p. 1419.) The mother participated in an assessment, which resulted in the San Diego Regional Center's (SDRC) conclusion that she did not have Prader-Willi syndrome. (*Id.* at p. 1420.) The appellate court granted the parents' writ of mandate petition, concluding, among other

---

**17** It is apparent that sometime between the filing of Dr. Sandoval's initial report on April 8, 2013, and the filing of her addendum report on September 9, 2013, there was a change of assigned social workers in this dependency proceeding which may have contributed to the Department's failure to provide or facilitate these examinations.

27

things, there was not substantial evidence to support the court's finding that the agency had offered reasonable services to either parent to reunify with their infant child. (*Id.* at pp. 1427-1428.)

As to the mother, the appellate court concluded that the agency failed to offer or provide a variety of services designed to address her physical disabilities. (*Tracy J.*, *supra*, 202 Cal.App.4th at p. 1427.) The court, asking a number of unanswered questions that demonstrated the agency's failings, observed: "A developmentally or physically disabled parent is entitled to services that are responsive to the family's special needs in view of the parent's particular disabilities. [Citation.] The evaluating psychologist said [the mother's] clinical presentation was unusual and required ongoing assessment. In October 2010 a social worker recommended that [the mother] have an evaluation by a medical professional to determine if she had Prader-Willi syndrome. That did not occur. If [the mother] did not have Prader-Willi syndrome, as SDRC determined, was her condition treatable? If the Agency disagreed with SDRC's assessment, why did it not try to locate alternate services for [the mother]? Would [the mother] have made progress in her ability to care for [the child] if she received occupational or physical therapy, or parenting skills training appropriate to her disabilities? The record does not support a finding the Agency adequately identified [the mother's] problems and provided services responsive to her needs. [Citations.]" (*Id.* at pp. 1427-1428.)

As was the case with the mother in *Tracy J.*, in this case, there were a number of unanswered questions concerning Father. Dr. Sandoval raised these questions in her assessment. The fundamental question relating to appropriate reunification services for Father's unique needs was: To what extent do any of Father's physical, psychological, emotional, or cognitive challenges resulting from his childhood accident impact his ability to reunify successfully with the minor? Because the Department took no action to refer Father to qualified professionals to conduct a comprehensive medical and

28

neuropsychological assessment as Dr. Sandoval recommended, the answer to this question is unknown.

Father relies extensively on *In re K.C.* (2012) 212 Cal.App.4th 323, another case we find to be instructive. There, this court, under circumstances somewhat similar to those here, considered whether there was substantial evidence to support the juvenile court's finding that the agency had offered reasonable services to the father. (*Id.* at p. 325.) The juvenile court had ordered the father to appear for a psychological examination, based upon the agency's stated concern in the case plan that he was potentially " 'suffer[ing] from mental health and/or cognitive functioning issues that can negatively impact [his] ability to parent appropriately.' " (*Id.* at p. 326.) The father complied with the court's order, and the evaluator reported there had been a history of schizophrenia on one side of the father's family; the father had concentration difficulties; and the father " 'present[ed] with an air[ ] of oddity' and 'social discomfort,' with 'an aloof, paranoid and irritable style.' " (*Ibid.*) The evaluator provided a preliminary diagnosis suggesting significant psychological impairment. (*Ibid.*)[18] He opined, the father " 'can parent, however, additional steps are necessary on his part to be safe to do so. Reunification services are recommended, as long as this parent is moving forward in helping himself to the resources made available to him.' " (*Ibid.*) The evaluator also noted, "[s]ervices that 'should be offered to treat the diagnosis' included '[m]edication and therapeutic management through psychotropic evaluation and treatment for possible mood and thought disorder.' " (*Ibid.*) The evaluation was provided to the social worker. (*Ibid.*) She discussed the matter with the father, who resisted the notion of taking

---

[18] The evaluator's preliminary diagnosis was: "On Axis I, mood disorder with obsessive-compulsive features, subject to ruling out posttraumatic stress disorder, and coupled with 'Identity Problem' and 'Cannabis Abuse (by history)'; and on Axis II, 'Paranoid Personality [D]isorder (preliminary).' " (*In re K.C.*, *supra*, 212 Cal.App.4th at p. 326.)

29

medication but indicated a willingness to meet with a psychiatrist. (*Id.* at p. 327.) The father attempted on multiple occasions to obtain further professional help from an adult clinic to which he was referred by the social worker, but the clinic refused to provide him with treatment or medication. (*Ibid.*) The agency did not attempt to obtain treatment for the father from another source after he had been refused treatment by the adult clinic. (*Id.* at p. 329.)

This court reversed the juvenile court's order terminating the father's reunification services, concluding the juvenile court's finding that the agency had offered reasonable services was not supported by substantial evidence: "It is true that the reasonableness of the services provided may depend to some degree upon the parent's willingness to cooperate in the completion of his or her reunification plan, and that [f]ather here exhibited a certain recurring reluctance to fully cooperate with the Department and others involved in his children's care. The psychologist's report indicated, however, that this less-than-full cooperativeness was itself a product of psychological conditions that might be responsive to pharmacological treatment. Had [f]ather refused to submit to the recommended medication evaluation, or refused to take such medications as might be recommended, his refusal would presumably have sustained a finding that reasonable services were provided. But here he was never placed in a position where such refusal was possible. The ' "problems leading to [his] loss of custody" ' [citation] all appeared to stem from his mental health issues. The Department quite properly undertook to identify those issues. But when it came to *addressing* them, the Department appeared to delegate the burden of finding and obtaining suitable services to [f]ather himself—despite the high likelihood that the very issues necessitating treatment would interfere with his ability to obtain it." (*In re K.C.*, *supra*, 212 Cal.App.4th at p. 330, fn. omitted.) The agency failed to persuade that it would have made no difference had it made an additional effort to locate treatment for the father because it was unlikely the father would have

30

been compliant: "[T]he Department was required to make a 'good faith effort,' including ' "reasonable efforts to assist the parents in areas where compliance proved difficult . . . ." [Citation.] 'The effort must be made,' moreover, regardless of 'the prospects of success.' [Citation.]" (*Id.* at p. 332.)

Although there are some distinctions between the facts in this case and those in *In re K.C.*, the agency in the latter case at least advised the father where he should go for a further evaluation as had been recommended during the court-ordered psychological evaluation. The agency's failure in *In re K.C.* was that, after the adult clinic refused to treat the father, the agency did nothing to find an alternate location where the father could receive treatment. (*In re K.C.*, *supra*, 212 Cal.App.4th at p. 329.) Here, Dr. Sandoval advised the Department that her office could not provide a full assessment of Father's condition to ascertain what he needed to "benefit from reunification services and obtain the skills to successfully reunify with his children." She recommended specific medical and neuropsychological evaluations by other providers to make that determination. Despite this advice and recommendation, the Department did nothing to provide or facilitate such evaluations.

The claim made at the hearing by the Department's attorney—that the Department had no obligation to provide further professional evaluations because Father's failure to reunify was due to his consistent incarceration, rather than because of any possible psychological deficits[19]—begs the question. Because of the complexity of Father's medical and psychological issues, Dr. Sandoval recommended comprehensive professional evaluations to clarify the nature and extent of his potential cognitive deficits

---

[19] Argument by the Department's counsel was interrupted by the court. ("It's more to do with his time in jail than it has . . . anything to do with his possible—.") It is apparent from the context of the argument and later statements that the argument by the Department's counsel was that Father's possible psychological deficits were not the cause of his doing poorly with his case plan.

"to determine . . . what accommodations or additional medical or mental health services [he] might need in order to benefit from reunification services and obtain the skills to successfully reunify with his children." If Father performed poorly with respect to his case plan, it may have been due to his lengthy periods of incarceration or other issues unrelated to any potential medical and psychological problems.[20] But without the evaluations described in Dr. Sandoval's reports, it cannot be said that such medical and psychological problems did *not* pose a barrier to Father's ability to benefit from reunification services.

There is no substantial evidence in the record to support the juvenile court's conclusion that a psychological evaluation was unnecessary because it appeared Father was not capable of benefitting from services. According to Dr. Sandoval, comprehensive evaluations by professionals were needed to determine whether Father's medical or psychological challenges caused him to need additional specialized support to help him with reunification efforts. Without those evaluations, it could not be determined whether Father was capable of benefitting from services.

The Department's failure to respond to Dr. Sandoval's recommendations for further evaluation of Father was not " '[a] good faith effort' to provide reasonable services responding to the unique needs of each family." (*In re Monica C.*, *supra*, 31 Cal.App.4th at p. 306.) Although it is possible Father may not successfully reunify with the minor, even if he is given accommodations that professionals may deem necessary after a comprehensive evaluation, "[a] forecast of failure could not provide an

---

[20] Although Father returned to custody shortly after the family assessment in March 2013, and remained in jail until July 2013, there is nothing in the record indicating the Department (1) took steps to contact him while he was in jail; (2) investigated to determine what services were available in jail to assist him with reunification; or (3) explored whether a medical, neuropsychological, or psychological evaluation as recommended by Dr. Sandoval could be conducted while Father was incarcerated. (See *Mark N. v. Superior Court*, *supra*, 60 Cal.App.4th at p. 1013.)

excuse for refusing to try." (*In re K.C.*, *supra*, 212 Cal.App.4th at p. 332.) Accordingly, we find there was no substantial evidence under the circumstances presented here for the court's finding, by clear and convincing evidence (see *In re Monica C.*, *supra*, 31 Cal.App.4th at p. 306), that the Department provided Father with reasonable reunification services. We will therefore reverse the order insofar as it terminated reunification services to Father, and will direct the Department to promptly offer Father the comprehensive professional evaluations recommended by Dr. Sandoval.[21] The juvenile court shall retain the discretion, based upon the circumstances presented and the proper application of the law, to terminate reunification services at any time. (*In re Aryanna C.*, *supra*, 132 Cal.App.4th at p. 1242.)

DISPOSITION

The order at the 12-month permanency hearing, insofar as it terminated family reunification services to Father, is reversed. The Department is directed that, upon remand, it shall promptly offer Father the comprehensive professional evaluations recommended in the family assessment evaluation conducted by psychologist Marni Sandoval, Psy.D., of the Monterey County Department of Public Health.

---

[21] As noted, at the 12-month permanency hearing, the court ordered that reunification services be continued for Mother, and it set the 18-month permanency review hearing for February 19, 2014. By order dated January 15, 2014, the juvenile court returned the minor to the physical custody of Mother; ordered that the minor continue to be a dependent child of the court; vacated the 18-month permanency review hearing previously set for February 19, 2014; and continued the case for a semi-annual review hearing on July 15, 2014. Pursuant to Evidence Code section 459, subdivision (a), we will take judicial notice of the juvenile court's January 15, 2014 order. We observe that, given these developments, it is unlikely that the additional services to Father will cause a delay in the proceedings below.

_____

Márquez, J.

WE CONCUR:

_____

Bamattre-Manoukian, Acting P.J.

_____

Grover, J.