Filed 10/17/14  Antonio P. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ANTONIO P.,<br><br>          Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN FRANCISCO COUNTY,<br><br>          Respondent;<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>          Real Party in Interest. | A142604<br><br>(San Francisco County<br>Super. Ct. No. JD13-3309) |

Petitioner Antonio P. (father), father of three-year-old Bonnie P., seeks review by extraordinary writ, pursuant to California Rules of Court, rule 8.452,[1] of the juvenile court's findings and orders, in which the court terminated reunification services and set the matter for a permanency planning hearing, pursuant to Welfare and Institutions Code section 366.26.[2]  Father contends substantial evidence does not support the juvenile court's finding that reasonable services were provided in the form of frequent and regular visitation.  We shall deny the petition for extraordinary writ.

---

[1] All further rule references are to the California Rules of Court.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 18, 2013, the San Francisco Human Services Agency (Agency) filed an original petition alleging that Bonnie P. came within the provisions of section 300, subdivisions (b),(g), and (j). Specifically, the petition alleged, inter alia, that father, who was Bonnie's presumed father, was incarcerated at San Bruno jail and was unable to provide for the then two-year-old child; that he had an extensive criminal history and a history of being involved with illegal drugs, domestic violence, and extended incarcerations, which placed Bonnie at risk of harm and neglect; that the mother's current whereabouts were unknown; and that both parents had failed to reunify with older siblings who had been removed from their home.

In a detention report filed on November 18, 2013, the Agency reported that Bonnie had been placed in protective custody on November 14, after father was arrested on an outstanding narcotics warrant. At the time of father's arrest, Bonnie was with him in a hotel room, where paraphernalia related to crack cocaine was found. Father's girlfriend was also present in the hotel room and narcotics were found on her person. Bonnie had been a court dependent from her birth in 2011 until June 2012, during which time father received family reunification and family maintenance services. Bonnie's mother did not engage in any services and, upon dismissal of the dependency, the court granted father full custody of Bonnie. Father had six other children between the ages of 14 and 24, none of whom he had raised. One of those children had been made a court dependent and father had failed to successfully reunify with that child.

On November 19, 2013, the juvenile court ordered Bonnie detained, and further ordered that she be placed in foster care, with father to have supervised visitation.

In a disposition report filed on December 24, 2013, the Agency reported that father remained incarcerated. The social worker had met with father, who told her that he was on probation and had been working to have his probation transferred to Georgia, where his wife—who is not Bonnie's mother—lived. Father had been making extended visits to Georgia, where Bonnie had been living with his wife. He recently had to bring Bonnie back to California, however, because his wife was undergoing chemotherapy

treatment and was unable to care for Bonnie in his absence. Father and Bonnie had been in California since about September, living in his motor home, which he parked around town. He acknowledged having a long history with illegal drugs, relationships involving domestic violence, and long periods of incarceration, but did not believe his lifestyle put Bonnie at risk.

Bonnie was two and a half years old, but "present[ed] as much older." She was strong-willed; was very friendly to strangers, without appropriate boundaries; and, according to her foster mother, she wanted to sleep during the day and was wide awake at night. Bonnie was being transitioned to the care of her paternal great-aunt, Rachel C.

The Agency recommended that reunification services be provided to father.

At a December 31, 2013 settlement conference on jurisdiction and disposition, father submitted to the allegations of an amended petition and the juvenile court took jurisdiction over Bonnie and ordered reunification services for father. The court also ordered that father, who was still incarcerated, would have supervised visitation at the jail.

On March 13, 2014, the juvenile court granted the Agency's request, made pursuant to section 388, to move Bonnie to the home of Rachel C., with whom weekend visits had gone well and to whom Bonnie had become attached.

In a status report filed on June 6, 2014, the Agency related that father had been released from jail in February. The social worker had last heard from him in April, when he left a message stating that he had been in Georgia for three weeks on business. He had not called the social worker or responded to her calls since then. Father had not been visiting regularly with Bonnie, although he did have positive interactions with her during two supervised visits in January, while he was incarcerated. During those visits, "[h]e played with her, comforted her and reassured her." Although he was allowed to see Bonnie at Rachel C.'s home, he stopped visiting regularly after February, and his contact had been minimal since then, with visits about once a month and occasional phone calls.

With respect to his case plan, father had not started individual therapy, had not shown that he had obtained suitable housing for himself and Bonnie, had not kept in

3

contact with the social worker, and had not begun any services other than complying with the terms of his probation.

Bonnie was three years old, was healthy, and seemed to be developmentally on track for her age. She was living with Rachel C., with whom she was doing well. Her behavior had improved and her anxiety had decreased. Rachel C. was taking excellent care of her and was committed to adopting her. Bonnie's extended paternal family, including her paternal grandmother, aunts, uncles, and cousins, all visited frequently.

The Agency recommended that father's reunification services be terminated and the matter set for a section 366.26 hearing, with adoption by her aunt, Rachel C., as the permanent plan.

At the July 22, 2014 six-month review hearing, social worker Christine Harris testified that father still had not started individual therapy or found suitable housing. Harris had called and spoken with father twice in the past month, and he had said that he was unable to schedule appointments with his preferred therapist because he was busy with other classes and a domestic violence program. He told her that he had completed his substance abuse assessment at the Homeless Prenatal Program. He was also in compliance with his probation requirements.

Since the status review report was filed on June 6, father had visited Bonnie once, in late June. He had told Harris that he was unable to contact Rachel C. to arrange visits with Bonnie. Harris's understanding, however, was that father had arranged to visit many times over the prior four months, but had not shown up for the visits, which was very disappointing for Bonnie. Bonnie and Rachel C. had also run into father on the bus prior to his most recent visit, and "probably in April and maybe May he had some visits, but it's been maybe once a month and not consistent." When Harris met with father, she had encouraged him and told him it was important for him to see Bonnie "regularly and often." Father "said he was able to see her at the aunt's and then also at his mother's house I believe, because his aunt brings Bonnie there every day. And so he would be able to visit her daily. But in fact he didn't do that." Harris acknowledged that father had recently told her, when she called him to talk about his case plan, that he had attempted to

4

visit Bonnie more frequently over the past month, but had not been able to reach Rachel C. to make the arrangements. However, during the months when his visits were sporadic, father had not contacted Harris to tell her he had problems seeing Bonnie.

While father was incarcerated, Bonnie had visited him twice, and the visitation reports reflected that he was attentive to her. Bonnie and father were also very affectionate with each other during the visits and Bonnie resisted being separated from father when the visits ended. There were not more visits during father's incarceration due to issues with the jail scheduling visits. Harris believed there was a positive attachment between father and Bonnie because "she looks forward to seeing him and is very disappointed when she can't."

Harris continued to recommend termination of father's reunification services. When asked whether she also believed his visitation should be terminated, Harris responded, "It's a difficult question because I feel like supervised visits and contact for Bonnie and her dad could be helpful. But because they have been so inconsistent I think it's really, it's traumatic for her. And so I think that that would have to be assessed" with Bonnie's therapist.

Father also testified at the hearing. For his required individual therapy, he had attempted to schedule an appointment with a therapist who had been his child psychologist and was a family friend. However, he was unable to actually meet with the therapist because he could not make it to the appointments on Friday morning, the only time the therapist had available.

With respect to visitation, father testified that he had been visiting Bonnie almost every day at his mother's home because Rachel C. was his mother's in-home care worker and she brought Bonnie with her to his mother's house. These visits started after he was released from jail in February 2014 until his mother went to Laguna Honda hospital, between three weeks and two months earlier. Since then, visits had become infrequent because Rachel C. would neither answer the phone when he called nor respond to his texts. He had seen Bonnie about four times in the last two months. Father loved Bonnie, and Rachel C.'s claims that he had not visited her regularly were not true. He had proof

5

that he had visited Bonnie often in the form of photographs on his cell phone. However, the phone had fallen into the toilet and he had lost all the photos.

Father had not spoken to Harris about problems with scheduling visitation with Bonnie until three weeks ago because he did not trust social workers and thought it would be a waste of time to talk to her. When he had recently spoken with Harris and she asked him why he had not called her, he told her he had called her "a bunch of times" and left messages, but she never responded. He also had called his attorney "dozens of times" and had "never gotten an answer."

Finally, father testified that his probation was being transferred to Georgia "next month."

At the conclusion of the hearing, the juvenile court stated, with respect to visitation, "clearly this child loves it when she sees her dad. But the sorry thing is, she crashes when he doesn't show up. And he makes representations and she has expectations that he is going to come and he doesn't show." The court further stated, "As we noted, visits have been inconsistent. The testimony, let's just say that I didn't find it particularly compelling that everything in support of his regular visits was destroyed by the frying, if you will, of his cell phone."

The court then found by clear and convincing evidence that reasonable services had been provided to father, that he had failed to participate regularly in his plan, and that there was not a substantial likelihood that Bonnie could be returned to his care within the next six months. The court therefore terminated father's reunification services and set the matter for a section 366.26 hearing.

On July 28, 2014, father filed a notice of intent to file a writ petition seeking review of the juvenile court's order.

## DISCUSSION

### *Substantial Evidence Supports the Juvenile Court's Finding that Reasonable Services Were Provided*

Father contends substantial evidence does not support the juvenile court's finding that reasonable services were provided in the form of frequent and regular visitation.

Section 362.1, subdivision (a)(1)(A), provides in relevant part: "[A]ny order placing a child in foster care, and ordering reunification services, shall provide . . . for visitation between the parent or guardian and the child. Visitation shall be as frequent as possible, consistent with the well-being of the child."

"Services will be found reasonable if the [Agency] has 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . .' [Citation.]" (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972-973.) "The adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case. [Citation.]" (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.)

We review the juvenile court's determination of whether the Agency provided reasonable services for substantial evidence. (*In re Alvin R. supra*, 108 Cal.App.4th at p. 971.)

In the present case, father's claim regarding lack of reasonable services focuses solely on the reasonableness of the services provided related to visitation. According to father, the Agency improperly delegated its responsibility to arrange regular visitation between him and Bonnie to Bonnie's aunt, Rachel C. He argues that even though he agreed to schedule visitation directly with Rachel C., that did not relieve the Agency of the responsibility of ensuring that reasonably frequent visitation took place, pursuant to the juvenile court's order.

We conclude there is substantial evidence that the Agency provided reasonable reunification services in this case. (See *In re Alvin R.*, *supra*, 108 Cal.App.4th at pp. 972-973.) That the Agency permitted father and Rachel C. to arrange for Rachel C. to supervise visitation in her home, instead of requiring him to attend supervised visits at the Agency or in another institutional setting, did not amount to an improper delegation of responsibility. Rather, the Agency implemented the court's order of regular visitation in

7

a way that the people involved, including father, believed would be best for Bonnie. (See *Robin V. v. Superior Court*, *supra*, 33 Cal.App.4th at p. 1164.)

As to father's claim that Rachel C.'s non-responsiveness kept him from regularly visiting with Bonnie, the juvenile court found that father was not credible in his testimony regarding visitation. Moreover, if father did in fact believe that Rachel C. was obstructing his visitation with Bonnie, he should have informed the social worker of the problem, so that a different visitation plan could be made. Instead, he did not maintain contact with the social worker, who attempted to reach out to him, and never expressed any concerns about visitation until shortly before the six-month review hearing. At the hearing, father's explanation for the delay in telling Harris about any scheduling problems was contradictory: he testified both that he did not trust social workers and thought it would be a waste of time to call *and* that he had called her and left messages numerous times, but she never returned his calls.

In sum, the evidence shows that any issues with visitation were due to father's failure to visit consistently and his failure to maintain contact with the social worker. Substantial evidence supports the juvenile court's finding that reasonable services were provided to father.[3] (*In re Alvin R. supra*, 108 Cal.App.4th at p. 971.)

## DISPOSITION

The petition for extraordinary writ is denied on the merits. Our decision is final as to this court immediately (rule 8.490(b)(2)(A)).

---

[3] Father apparently believes the circumstances of this case are analogous to those in *In re Monica C.* (1995) 31 Cal.App.4th 296, which involved an incarcerated parent's appeal following termination of parental rights. In *In re Monica C.*, at pages 306-307, the appellate court reversed the juvenile court's order terminating parental rights because, inter alia, the reunification plan failed to provide for visitation between the mother and child while the mother was in prison and the Social Services Department believed "that visitation could serve no good purpose" since the mother was sentenced to a term of more than 18 months in prison. (*Id.* at p. 308.) The facts and issues addressed in that case, however, are plainly dissimilar to those raised here.

8

                                       _____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Stewart, J.