31 Cal.App.4th 296 (1995)
36 Cal. Rptr.2d 910
In re MONICA C., a Person Coming Under the Juvenile Court Law.
HUMBOLDT COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
PAMELA C., Defendant and Appellant.
Docket No. A064060.
Court of Appeals of California, First District, Division One.
January 3, 1995.
*298 COUNSEL
Stephen Falor for Plaintiff and Respondent.
Stephen Greenberg for Defendant and Appellant.
OPINION
NEWSOM, J.
This appeal from an order terminating parental rights of a prison inmate presents a troubling record of intervention by the Department of Social Services of Humboldt County (hereafter DSS).
The minor, Monica C., is the sixth child of Pamela C. (appellant), who has an extensive criminal record dating from her addiction to heroin in the late 1970's and a history of losing custody of previous children. According to a DSS report, her first marriage produced three children who "were passed around to different relatives' homes." The two children of a second marriage are now in the guardianship of their paternal grandparents.
*299 Following her third marriage, appellant and her husband, Todd C., were sentenced to state prison in 1989. Being pregnant at the time of imprisonment, Pamela gave birth to a daughter, Monica C., on June 28, 1990. A week after birth, the infant was entrusted to appellant's great aunt, Betty Martin, and her husband, Wayne Martin. On September 5, 1990, Pamela was released and assumed custody of the child. She was later arrested for a parole violation on January 16, 1991, and incarcerated in a local jail. On May 26, 1991, she was released on parole and again took custody of the child until August 29, 1991, when she was arrested for another parole violation and committed to the California Women's Institute in Stockton, California, for a term of eight years and eight months. In presentations to the juvenile court, both appellant and DSS calculated appellant's earliest release date as being in July 1995. The father remained in prison throughout this period and does not join in this appeal.
The involvement of the DSS in the case appears to date from a petition filed by Betty Martin for guardianship over the child. In a home evaluation, the DSS found that the Martins did not have the physical abilities to be "appropriate long-term guardians for Monica" and recommended denial of the petition. The report stated that the DSS would file a dependency petition should the guardianship be denied. Although the record is incomplete, it appears that the court followed the DSS's recommendation to deny the guardianship.
On February 25, 1992, the DSS filed a juvenile dependency petition alleging a failure to protect the child under Welfare and Institutions Code section 300, subdivision (b), and lack of provision for the child's support under Welfare and Institutions Code section 300, subdivision (g).[1] The allegation under subdivision (g) stated that the parents were incarcerated under "lengthy terms of confinement ... [and] failed to make appropriate long-term plans for the care of the child." At a contested jurisdictional hearing on May 1, 1992, the DSS presented no evidence relating directly to appellant's physical and mental capability to make plans for the care of the child. The only evidence relating to her ability to "arrange for the care of the minor," within the meaning of section 300, subdivision (g), consisted of her personal history and testimony relating to Betty Martin's ability to care adequately for the child on a long-term basis. The DSS relied implicitly on the questionable inference that, since appellant had made a poor choice in leaving the child with Betty Martin, she could be found generally to be incapable of arranging for the care of the child.
Following the hearing, the juvenile court upheld the allegation under section 300, subdivision (g), while finding the allegation under section 300, *300 subdivision (b) to be not true. In the subsequent dispositional hearing, the court declared the minor a dependent of the court but allowed her to remain in the custody of Betty Martin. Appellant did not appeal from the jurisdictional or dispositional order, and therefore the sufficiency of the evidence for these orders is not before us in this appeal.
Pursuant to section 361.5, subdivision (e)(1), the dispositional order required the DSS to provide family reunification services and approved a "Family Reunification Services Agreement" between the DSS and the mother. The agreement made no provision for visitation between the child and appellant but instead required appellant to write and call the child monthly and to send pictures of herself to the child's caretaker. In addition, appellant was directed to enroll in any programs relating to substance abuse and parenting that might be offered in prison.
At the time of the dispositional hearing, appellant was pursuing an application to gain admission to a mother/infant program of the department of corrections that would allow her to care for the child while in prison. The state program, operated in seven small facilities, provided beds for a total of only ninety-four inmates throughout the entire prison system. Accordingly, admission was subject to rigorous screening standards. In a decision dated September 10, 1992, the Department of Corrections definitively denied appellant's admission into the program.
At the six-month review hearing on December 29, 1992, the DSS submitted professional evaluations by Bettye S. Elmore, Ph.D., and Carmela Wenger, MFCC, recommending long-term placement in a foster home with a likelihood of adoption. Without interviewing appellant herself, both professionals drew their knowledge of her case entirely from personal history appearing in DSS files. At the conclusion of the hearing the court found, pursuant to section 366.21, subdivision (e), that the return of the minor to the parent's custody would "create a substantial risk of detriment to the [minor's] physical or emotional well-being" in view of "the incarceration of both parents, their sentence lengths, their recidivism, ... and Pam's poor parental record." The court continued the child's placement with Betty Martin until a long-term foster home could be found and approved a modified reunification plan services agreement.
The modified agreement required appellant to send the DSS by January 8, 1993, "a list of available services" at her prison that would allow her caseworker "to focus on the problems that led to [her] incarceration[] and removal of [her] child. These services may include (but [are] not necessarily limited to): Parenting classes, substance abuse counseling (with aftercare *301 such as Alcoholics Anonymous or Narcotics Anonymous), library resources for parenting information, phone access, visitation privileges, etc."
On January 4, 1993, the DSS filed a supplemental petition under section 388 recommending placement of the child in the home of a "foster caretaker, which may include a fost/adopt placement in or outside of Humboldt County." The petition was supported by a home study which found that "Mr. and Mrs. Martin are an older couple, ages 57 and 64, who cannot be approved for the long term placement of Monica." Following a contested hearing, the court allowed the petition in an order entered March 3, 1993.
The 12-month review report indicated that the minor suffered from serious behavior problems and delayed development, but a prospective "fost/adopt home" for the child had nevertheless been located out of the county. It recommended termination of reunification services and a hearing for permanent placement of the child pursuant to section 366.26.
At a contested 12-month review hearing on June 16 and 17, 1993, appellant testified to her efforts to comply with the reunification plan. She wrote the child weekly through December 1992, enclosing pictures with her letters. She also made frequent collect calls for a while "but it was real hard to get them to take [her] calls." She checked out books on parenting from the prison library and attended 10 Alcoholics Anonymous meetings, although the meetings were later cancelled because of "a lot of disruption...." The prison did not offer parenting classes, and it gave substance abuse classes only to prisoners nearing their release date.
Although the reunification plan did not provide for personal visitation, the maternal grandmother, Wanda Faust, brought the child about twice a week to visit appellant through a glass barrier at the county jail during the period she was confined there. In state prison, appellant got a court order compelling the DSS to pay transportation costs for the child to make three "family visits" in August and October 1992, and March 1993. The visits took place in a kind of "bedroom apartment" in the prison and each lasted two days. The prison authorities also permitted "all day visits, Saturdays and Sundays." As Pamela explained, "they have a big visiting room and they have like a patio outside... and toys and stuff for kids." The DSS caseworker, Bob Settles, never assisted her in arranging prison visits with the child.
Appellant admitted that she did not send her caseworker the list of prison services by the deadline of January 8, 1993, imposed by the modified reunification plan services agreement. She explained she did not receive "the papers" until sometime in January, and since they were "dated in November *302 or December," she didn't think "they were good any more." In any event, she had inquired repeatedly and knew that no programs were available to her. Corroborating her testimony, the DSS caseworker, Bob Settles, recalled that the services agreement was "written in December" but "ordered in January."
When appellant learned of the court's finding that she could not arrange for the child's care, she gave the DSS the names of two alternative caretakers: her sister, Juanita Hendricks, and a friend, Donna Craddock. The DSS did not investigate either person. Testifying at the hearing, Craddock said she inquired about the possibility of becoming the child's guardian, but the DSS told her that she had "no chance" of being appointed a guardian unless she was willing to adopt the child before appellant got out of prison. She would not take the child on these terms because she "didn't want to break off the relationship" between mother and child.
Testimony in earlier hearings indicated that the DSS did not actively investigate the possibility of providing Betty Martin with assistance that would enable her to better care for the child. Martin testified that her DSS caseworker never discussed such assistance and did not offer any services or direct her to professional counseling or evaluation. However, on the insistence of the court, the DSS did make foster care payments and gave its approval to periodic respite care with the maternal grandmother, Wanda Faust. The child also attended preschool but the record is not clear as to the role, if any, that the DSS played in arranging for this activity.
The DSS caseworker assigned to the case, Bob Settles, testified that he had never spoken face-to-face with appellant or met her except "just to say `hello' in this courtroom." He made no effort to contact her while she was in local jail for a period of time in the fall of 1992. As early as April 1992, he told her that he would seek a permanent placement for the child unless she succeeded in getting into the mother/infant program. By July 1992, he had come to believe that reunification services were detrimental to the child. For her part, appellant "attempted several times" to call Settles but only reached him twice. He talked to her as if "his mind was made up."
When asked what reunification services the DSS provided to appellant, Settles mentioned only two services: under compulsion of a court order, he had arranged for the payment of the child's transportation costs for prison visits and he "was trying to establish what services were available" to appellant in prison. In other testimony, he acknowledged that he actually had personal access to this information through communications with her prison caseworker and other prison officials. As early as May 19, 1992  the date *303 the court approved the first reunification agreement  he knew that she did not have an opportunity to enroll in parenting or substance abuse classes, and he knew that budgetary cutbacks forced the termination of other services as of February 1993, a date shortly after appellant was required to apprise him of these services.
The 12-month review report of the DSS mentioned an additional reunification service provided to appellant: the DSS paid for collect phone calls to the child from prison. The reunification plan services agreement dated May 5, 1992, also states that the DSS gave appellant the telephone number and address of her great aunt, Betty Martin.
Following the 12-month review hearing, the juvenile court made a series of findings required by sections 366.21, subdivisions (f) and (g)(3) and 366, subdivision (a). Among other things, it found that "reasonable services have been provided to or offered to the parents which were designed to aid the parents to overcome the problems which led to the initial removal of the child." The court then ordered that reunification services be terminated under section 366.21, subdivision (h), and that a hearing be held within 120 days for termination of parental rights pursuant to section 366.26.
In a report prepared for the section 366.26 hearing, the DSS stated that the minor "is currently placed in a fost-adopt home. She is doing well in this placement." Despite behavioral problems and delays in intellectual development, she was "assessed by State Adoptions and determined to be an adoptable child." After receiving the report in evidence and hearing the arguments of counsel, the juvenile court found "[b]y clear and convincing evidence, it is likely the child will be adopted." On this finding, the court terminated appellant's parental rights and ordered that the child be placed for adoption.
In appealing from the order terminating her parental rights, appellant does not challenge the finding that the child was adoptable but rather attacks the order indirectly on the ground that the record does not support the finding at the 12-month review hearing that she was provided reasonable reunification services. Section 366.26, subdivision (c)(1), allows termination of parental rights upon a finding of the minor's adoptability, provided that the court has made one of a series of findings in a previous stage in the proceeding. At issue here is the finding "pursuant to Section 366.21 ... that a minor cannot or should not be returned to his or her parent or guardian." (§ 366.26, subd. (c)(1).)
Two subdivisions of section 366.21 are relevant. Subdivision (f), provides that, in determining whether return of custody to the parent "would create a *304 substantial risk of detriment" to the child, the court must consider "whether reasonable services have been provided ... to the parent" and whether the parent has "cooperated and availed himself or herself of services provided." Subdivision (g)(3) makes the provision of reasonable services to the parent an absolute condition for the termination of parental rights: the court may "[o]rder that a hearing be held within 120 days, pursuant to Section 366.26, [which may lead to termination of parental rights], if there is clear and convincing evidence that reasonable services have been provided or offered to the parents." These services clearly include reunification services. (Cynthia D. v. Superior Court (1993) 5 Cal.4th 242, 249 [19 Cal. Rptr.2d 698, 851 P.2d 1307].)
The broader statutory context establishes certain parameters for our consideration of the reasonableness of reunification services. In particular, we note that the Legislature has set an outer limit of 12 months, or under some circumstances 18 months, "for the court to determine whether the child is to be returned to the parents or permanently placed elsewhere." (In re Dino E. (1992) 6 Cal. App.4th 1768, 1776 [8 Cal. Rptr.2d 416].) The court must conduct a review hearing six months after the initial dispositional hearing. (§ 366.21, subd. (e); § 366, subd. (a); Cal. Rules of Court, rule 1460.) Unless the child is then returned to the custody of the parents or the case referred to a permanency hearing, the court will set a further 12-month review hearing, in which it has the choices of returning the child to custody of the parent (§ 366.21, subd. (f)), ordering that the child remain in long-term foster care, referring the case to a permanency hearing within 120 days pursuant to section 366.26, or continuing the case to a further 18-month hearing. (§ 366.21, subd. (g)(1-3); Cal. Rules of Court, rule 1461; for conduct of 18-month hearing, see § 366.22 and Cal. Rules of Court, rule 1462.) "`At the permanency hearing, the court has only three options: Termination [of parental rights] leading to adoption, guardianship, or long term foster care.'" (In re Marilyn H. (1993) 5 Cal.4th 295, 303 [19 Cal. Rptr.2d 544, 851 P.2d 826].)
The parallel provisions of section 361.5, subdivision (a), limit reunification services to "`a maximum time period not to exceed 12 months', which under certain circumstances may be extended to 18 months." (In re Zacharia D., (1993) 6 Cal.4th 435, 446 [24 Cal. Rptr.2d 751, 862 P.2d 751], fn. deleted.) Services may be extended for this additional six-month period "if it can be shown that the objectives of the service plan can be achieved within the extended time period." (§ 361.5, subd. (a).)
(1) Two statutes dealing with incarcerated parents  section 300, subdivision (g), and section 361.5, subdivision (e)  are engrafted onto this statutory scheme. Section 300, subdivision (g), authorizes the juvenile court to *305 adjudge a minor a dependent child of the court where "the minor's parent has been incarcerated or institutionalized and cannot arrange for the care of the minor...." (See also Cal. Rules of Court, rule 1456(d)(8).) The careful analysis found in In re Aaron S. (1991) 228 Cal. App.3d 202 [278 Cal. Rptr. 861] provides an authoritative interpretation of the statutory language. The court concluded that "[t]he use of the present tense verb in the statute, `cannot arrange,' indicates that the circumstances justifying the dependency must exist at the time of the hearing. [Citations.] Accordingly, section 300, subdivision (g) applies when, at the time of the [jurisdictional] hearing, a parent has been incarcerated and does not know how to make, or is physically or mentally incapable of making, preparations or plans for the care of his or her child." (Id. at p. 208.)
In In re Aaron S., supra, 228 Cal. App.3d 202, the court removed the minor from the custody of his mother, who was charged with abuse under section 300, subdivision (a), and placed him with the child's paternal grandmother. The father, who was incarcerated throughout the proceedings, approved this placement but contested the portion of dependency petition alleging that he came within the provisions of section 300, subdivision (g). The evidence, he argued, did not prove that he was unable to arrange for the child's care. Finding that the juvenile court improperly construed section 300, subdivision (g), the court remanded the case for a hearing on the incarcerated father's present ability to arrange for his child's care.
As construed in In re Aaron S., supra, 228 Cal. App.3d 202, section 300, subdivision (g), requires only that an incarcerated parent arrange adequately for the care of the child during the period of his or her incarceration. It is irrelevant whether or not the caretaker is a suitable long-term placement. Thus, contrary to the presupposition of the DSS in the present case, an aging relative who would not qualify for long-term custody under a guardianship petition may still be able to provide adequate care during the remainder of the parent's prison term under the provisions of section 300, subdivision (g).
Section 361.5, subdivision (e)(1), the only other statute addressing parental rights of incarcerated parents, states conditions for the denial of reunification services and provides guidance for designing reunification services for such parents. The statute provides that reunification services may be denied where the court determines "those services would be detrimental to the minor." In determining detriment, the court is directed to consider various factors, including "the length of the sentence...." The denial of reunification services under this provision provides the basis for a permanency hearing under section 366.26. (§ 361.5, subd. (f).)
Where the juvenile court orders reunification services for an incarcerated parent, section 361.5, subdivision (e)(1) provides that the "[r]eunification *306 services are subject to the 18-month limitation imposed in subdivision (a). Services may include, but shall not be limited to, all of the following: (A) Maintaining contact between parent and child through collect phone calls. (B) Transportation services, where appropriate. (C) Visitation services, where appropriate. (D) Reasonable services to extended family members or foster parents providing care for the child if the services are not detrimental to the child. An incarcerated parent may be required to attend counseling, parenting classes, or vocational training programs as part of the service plan if these programs are available."
(2a) We turn now to the issue on appeal: the reasonableness of the reunification services. "In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the respondent. We must indulge in all legitimate and reasonable inferences to uphold the verdict. If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (In re Misako R. (1991) 2 Cal. App.4th 538, 545 [3 Cal. Rptr.2d 217].) The DSS argues that, despite the lack of personal contact with appellant, it complied with section 361.5, subdivision (e)(1), in at least a minimal fashion. It paid for some collect telephone calls, arranged for the child's transportation under court order, allowed visitation both in local jail and state prison, made foster care payments to Betty Martin, approved respite care by Wanda Faust, and explored the services available to appellant in prison. The absence of needed programs in prison, it contends, does not affect the reasonableness of the reunification services. (Cf. In re Christina L. (1992) 3 Cal. App.4th 404, 417 [4 Cal. Rptr.2d 680].)
Section 361.5 has been construed, however, to require "[a] good faith effort" to provide reasonable services responding to the unique needs of each family. (In re Kristin W. (1990) 222 Cal. App.3d 234, 254 [271 Cal. Rptr. 629].) Moreover section 366.21, subdivision (g)(3), requires "clear and convincing evidence" that such services have been offered to the parents. Under this burden of proof, "evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind." (In re David C. (1984) 152 Cal. App.3d 1189, 1208 [200 Cal. Rptr. 115].) When judged by this standard, we find the reunification services deficient in certain respects.
The failure of the reunification plan to provide for visitation between the child and appellant represents a grave shortcoming that was only partially remedied by appellant's own efforts and the court order for payment of transportation costs. Where a child is removed from a parent's custody in a dependency proceedings, the general rule, stated in California Rules of *307 Court, rule 1456(e)(2), is that "the court shall order visitation between the child and the parent or guardian, to be as frequent as possible, consistent with the well-being of the child." In the case of an incarcerated parent, section 361.5, subdivision (e)(1)(C) states that reunifications services may include "[v]isitation services, where appropriate." Section 366.26, subdivision (c)(1)(A), contemplates that the court will review the record of visitation before terminating parental rights. The termination may be denied if the parent has "maintained regular visitation and ... the child would benefit from continuing the relationship...." (See also Cal. Rules of Court, rule 1463(d)(1)(B)(i).)
The absence of visitation will not only prejudice a parent's interests at a section 366.26 hearing but may "virtually assure[] the erosion (and termination) of any meaningful relationship" between mother and child. (In re Brittany S. (1993) 17 Cal. App.4th 1399, 1407 [22 Cal. Rptr.2d 50].) In the present case, appellant's prison was not excessively distant, and it allowed both weekend visitation in a visiting room and occasional two-day family visits in a facility resembling an apartment. Although appellant succeeded in arranging three such family visits, we conclude that the reunification plan was unreasonable to the extent it failed to plan for a continuing series of visitations.
Alluding to the minimal reunification services, the DSS suggests that the reunification plan was intended merely to allow appellant to apply for the mother/infant program of the Department of Corrections. The court has no statutory authority, however, to approve a reunification plan for the limited purpose of awaiting the outcome of an application to this very selective program. As stated in In re Brittany S., supra, 17 Cal. App.4th at page 1406, when the minor "was declared a dependent under section 300, [the agency] did not contend (and the trial court did not find) that reunification services would be detrimental to [her]. Accordingly, when the court ordered a reunification plan for this mother and daughter, it was required to be a reasonable one." In our opinion, a reasonable plan must take advantage of existing opportunities for visitation, without conditioning personal contact between a parent and small child on admission to a limited prison program.
The DSS, moreover, acted unreasonably in delegating to appellant the responsibility of sending her case worker a list of available services in prison. Section 361.5, subdivision (a), places on the agency the duty to provide services to the parent "for the purpose of facilitating reunification of the family"; the discharge of this duty obviously entails the preliminary task of identifying services available to the parent. By requiring appellant to perform this preliminary task, the DSS evaded its statutory obligation to *308 provide reunification services. The requirement in fact casts doubt on the agency's good faith. The requested information was of little value  the caseworker knew that prison services were minimal or nonexistent  and it was easily available from other sources. The demand for the information thus has the appearance of a trap, justifying the termination of appellant's parental rights without actually aiding the agency in providing needed services.
(3) The DSS objects that visitation could serve no good purpose. Since appellant was sentenced to a term of more than 18 months, the child could not be returned to her. The objection raises an issue requiring some extended consideration.
Section 366.21 permits return of the child only to the physical custody of the parent  an obvious impossibility when the mother is in prison and fails to qualify for the mother/infant program. (See also § 366.22.) Before the child of an incarcerated parent is adjudicated a dependent, the parent may retain legal custody even though the child is in the actual physical custody of another person under some private arrangement; but after the declaration of dependency, the child cannot be returned to the legal custody of the parent under such a private arrangement since the statute authorizes only return to the parent's physical custody. A similar paradox proceeds from the fact that section 366.26 authorizes only long-term placement to a guardian or foster parent. Before a child comes within the jurisdiction of the juvenile court, section 300, subdivision (g), permits an incarcerated parent to make suitable short-term arrangements for care of the child, extending only to the expected duration of the sentence; but after the juvenile court intervenes, the court must make a long-term placement, which by its terms will ordinarily extend well beyond the sentence term.
In In re Brittany S., supra, 17 Cal. App.4th at page 1402, the court commented, "[w]hile `use a gun, go to prison' may well be an appropriate legal maxim, `go to prison, lose your child' is not." By this reasoning, it might seem to follow that the mother of a dependent child should not lose the child because she is sentenced to a term of more than 18 months and fails to qualify for a selective mother/infant program. But sections 366.21 and 366.26 in fact allow only limited avenues for avoiding this result.
Appellant sought to pursue one of these avenues by nominating her friend Donna Craddock as the child's guardian. (See Prob. Code, §§ 1500 and 1510.) Craddock could be appointed as guardian only on a finding that the guardianship is "the appropriate permanent plan," (Cal. Rules of Court, rule 1464(d)(1); § 366.26, subds. (b) & (d)), but the guardianship could provide *309 for visitation by the mother (§ 366.26, subd. (c)(4); Cal. Rules of Court, rule 1464(d)(2)), and could later be terminated by court order if it should be in the child's best interest. (Cal. Rules of Court, rule 1465(c); Prob. Code, § 1601.) Under Section 366.3, subdivision (b), the termination of a guardianship may sometimes lead to reunification with the parent.
Another potential avenue for an incarcerated mother to preserve ties with a dependent child consists of placement with a relative, such as appellant's great-aunt, Betty Martin. The practical importance of this option is recognized by section 361.5, subdivision (e)(1)(D), which provides that reunification services to an incarcerated parent may include "[r]easonable services to extended family members ... providing care for the child...." In making a relative placement following a declaration of dependency, the court is directed by section 361.3, subdivision (a)(6)(E), to consider the ability of the relative to "[f]acilitate court-ordered reunification efforts with the parents."
Relative placements, however, are ordinarily temporary arrangements, leading to appointment of the relative as a guardian or other permanent disposition. (See § 281.5; § 319, subd. (d), and § 361.3.) Under section 366.26, subdivision (c)(4), the court may sometimes continue such a placement as the permanent plan for the child: "When the minor is living with a relative ... who is willing and capable of providing a stable and permanent environment, but not willing to become a legal guardian, the minor shall not be removed from the home if the court finds the removal would be seriously detrimental to the emotional well-being of the minor...." (See also Cal. Rules of Court, rule 1463(d)(1)(B)(iv) and (d)(4).) But the language clearly contemplates that such a permanent placement should be made only where the relative, if willing, would qualify as a guardian.
The practical importance of guardianship and relative placement leads to the question whether the duty of the DSS to provide reunification services entailed an obligation to consider the merits of these alternatives. In its briefs, the DSS views the goal of reunification as being restricted to actual physical custody. We consider, however, that it encompasses the larger purpose of exploring ways of protecting the "parents' interest in the companionship, care, custody and management of his children...." (In re Marilyn H., supra, 5 Cal.4th 295, 306; In re Zacharia D., supra, 6 Cal.4th at p. 446.)
The purpose of dependency proceedings, and in particular of reunification services, is to "safeguard parent's rights to raise their own children whenever this can be done without prejudice to the welfare of the child." (In re Aaron *310 S., supra, 228 Cal. App.3d at p. 211; see also Cynthia D. v. Superior Court, supra, 5 Cal.4th at p. 253.) It would undermine this purpose to make reunification services an all or nothing proposition, calling for return to physical custody or adoption by an unrelated party. These extreme solutions, it is true, may well represent the best options for a small child needing a secure attachment to a parent figure. But if reunification services are to serve the statutory purpose of safeguarding parental interests, they should also consider the possible merit of intermediate solutions which preserve some contact between parent and child.
(2b) In the case at bar, we think the DSS acted inconsistently with respect to its obligations to provide reunification services by refusing to give consideration to a prospective guardian, Donna Craddock, nominated by appellant. Although the record reveals nothing about Craddock's actual qualifications, it discloses that the DSS recognized no obligation to investigate or evaluate objectively her offer to serve as a guardian. She was instead rebuffed with inaccurate information regarding the necessity of adoption.
But in view of the earlier denial of Betty Martin's petition for guardianship, we do not find that the DSS was obliged to consider transforming this relative placement into a guardianship.[2] We have no disagreement in principle with appellant's argument on this point. Reunification services ordinarily should consider ways of assisting a relative caring for the dependent child of an incarcerated parent so that the placement can be continued for the longer term. Acting contrary to this established pattern, the agency in fact gave little consideration to the possibility of improving the quality of care in Martin's home. Nevertheless, we think the DSS's actions were justified by the judicial order denying Betty Martin's petition for guardianship. The agency was not obliged to consider ways of establishing the arrangement as a long-term placement that would presumably call for filing a petition similar to that which had recently been denied.
We hold that the trial court erred in finding, pursuant to section 366.21, subdivision (g)(3), that reasonable reunification services had been provided to appellant. Where the juvenile court finds at the 12-month review hearing that reasonable services have not been provided, it is required by section 366.21, subdivision (g)(1) to hold an 18-month hearing in 6 months: "The court shall continue the case only if it finds ... that reasonable services have not been provided to the parent or guardian." On remand, the juvenile court can comform most closely with this statutory scheme by ordering reunification services and setting a final review hearing under section 366.22 *311 in six months' time. (§ 366.22.) Appellant informs us that she has obtained a reduction of her prison term and will be released before the end of the year. The reunification services can thus be offered under normal conditions applying to a non-incarcerated parent.
The judgment terminating parental rights is reversed. The trial court is ordered to direct DSS to develop a reunification plan consistent with the views expressed in this opinion.
Strankman, P.J., and Dossee, J., concurred.
NOTES
[1] Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code.
[2] On the question whether a great-aunt qualifies as a "relative," compare section 319, subdivision (d) and section 361.3, subdivision (c)(2).