Filed 4/11/16  In re A.M. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | H042393 (Santa Clara County Super. Ct. No. 1-14-JD22403) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. P.M., Defendant and Appellant. | |

Following a six-month review hearing in a dependency proceeding, the juvenile court terminated reunification services for appellant P.M. (father) with his biological child, A.M. (child).  On appeal, father argues the juvenile court erred by denying him additional reunification services because he both participated regularly and made substantive progress in his court-ordered treatment plan.

We find the juvenile court's order is supported by substantial evidence, and will affirm.

I. **FACTUAL AND PROCEDURAL BACKGROUND**

A. *Initial dependency proceedings*

C.M. (mother) was incarcerated at Elmwood Correctional Facility when she gave birth to child in February 2014.  Mother had failed to make arrangements for child's care,

so child was taken into protective custody by the Santa Clara County Department of Family and Children's Services (Department). The Department filed a Welfare and Institutions Code section 300[1] petition on February 28, 2014 and a first amended petition on July 8, 2014.

In the report accompanying the petition, the social worker noted that father advised he was unable to care for child at that time "as a result of his housing situation." He also requested a paternity test because he was uncertain he was the biological father.[2] The social worker also indicated concerns about placing child with father as he "does not yet have a viable plan for how he will be able to care for the child as a single parent." He e-mailed the social worker in April stating he has located a hotel in Stockton he can afford on a monthly basis and has located childcare in Stockton as well. However, when the social worker asked how many hours a week he would require childcare, father stated "he will need childcare 7 days a week from 9-5pm [sic]."

The social worker's report indicated father "has exhibited behaviors that have led professionals and others to believe that he may be mentally unstable." He sent e-mails to the social workers involved in child's case that were "difficult to understand," as well as occasionally abusive and profane.[3]

Following a contested jurisdictional/dispositional hearing, the juvenile court sustained the allegations of the first amended petition, under section 300, subdivision (b) (failure to protect). According to the sustained allegations, mother had: (1) a history of mental illness; (2) been diagnosed with depression and schizophrenia; (3) been placed on

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

[2] Mother reported she met father approximately one year before child was born when they were "both homeless." Father disputed being homeless at any time, but admitted he "has not had stable housing." He attributed his housing difficulties to "behaviors [mother] exhibited when they were residing together."

[3] Copies of these e-mails were attached to the report.

2

multiple psychiatric holds since child's birth; (4) a history of refusing to take her prescribed psychotropic medication; and (5) a criminal history.

The juvenile court sustained allegations that father: (1) "display[ed] erratic and explosive behavior indicative of an undiagnosed and untreated mental health condition"; (2) had been a victim of domestic violence perpetrated by mother; (3) had ongoing contact with mother; and (4) expressed a desire to reunite with mother as a couple. The court declared child a dependent of the court and ordered out-of-home placement. The Department was directed to provide reunification services to both mother and father. Father's court-ordered treatment plan required him to participate in a parenting orientation class, a parenting class, a psychological evaluation, on-demand drug testing, and a domestic violence victims' support group.

The juvenile court conducted an interim review in September 2014. The Department's report for that interim review noted that mother and father had been living together in a "room/apartment" since mother's release from jail in July 2014. That report also indicated that father had completed his parenting class, but was "disruptive" and "disrespectful to the instructor" at the first session of his parent orientation class. The instructor advised father he was not welcome to the second session and that she would call security if he returned to her classroom. The Department referred father to another parent orientation class.

B.      *January 2015 six-month review report*

In the initial six-month review report, prepared in January 2015, the social worker recommended continuing reunification services, with the addition of individual therapy for father. Mother and father were still cohabitating, with father working as a handyman to support them. He reported that he and mother were getting along, but expressed concern that she was " 'selfish,' 'lazy' and 'self-centered[']" and did not "contribute to the household." Father said he did not trust mother around other men and was afraid she would leave him or " 'sell her body' " for money.

3

According to the social worker, father has gained confidence in handling child during his visits with her, and has learned from the foster parent's coaching and modeling. Foster father "reports that the father is now doing very well at the visits with [child]."

The social worker also noted that father's "attitude and demeanor towards this social worker and the Department has greatly improved. [Father] has not sent any erratic, angry e-mails to this worker. He has been very rational in his demeanor, reasonable in thought and always willing to listen." Although he had completed his parenting class, the social worker included the following comments from the class facilitator: " 'Though [father] attended most of the classes and his participation was good but at times he would ask unrelated-not related to the topic or try to get the attention of his peers by talking negative. When redirected he would be very angry and start blaming the system for involving as he saw the baby only for a few weeks.' " (*Sic*.)

The social worker included father's psychological evaluation, which concluded that father was not "currently experiencing the symptoms of an acute mental health disorder[, but] does seem to be experiencing some of the traits consistent with an Obsessive-Compulsive Personality Disorder." The evaluator also noted that father's "responses [to certain tests] revealed a bias toward presenting himself in a 'very positive light' by denying several minor faults and shortcomings that most people acknowledge." Along those same lines, the evaluator wrote "[father] seems to be alert to the perception of others and seeks to avoid disfavor by modify [*sic*] his behavior to conform to the desires of others. However, as [father] works to conform to the desires of others, he may deeply resent those to whom he conforms and submits. His resentment may periodically erupt in the fall of derisive commentaries that he tries to quickly withdraw or dilute with expressions of contrition, which is consistent with his history of angry emails."

4

C.    *March 2015 addendum to the January 2015 report*

In this addendum, the social worker changed her prior recommendation and recommended terminating reunification services for *both* parents.  The social worker explained that her original recommendation had been based on her (mistaken) assumption that the 12-month review hearing would take place in August 2015.  However, she "now understands that the Twelve Month Review Hearing must be held on or before April 26, 2015" and she "does not believe that there is a substantial probability that the child can be safely returned to either or both of the parents with only two more months of services."  The social worker acknowledged mother and father had done everything in their case plan, but she remained concerned about the mental health of *both* parents.  Specifically, she noted "father's expression of his anger, through angry phone calls and e-mails, his extreme reactions, inappropriate behaviors observed by this worker and by other[] professionals, and a lack of a support system for himself and [mother]."

D.    *Contested six-month review hearing and order*

The juvenile court conducted a contested six-month review hearing in March 2015.  The social worker, mother, mother's expert witness regarding reunification services, and father all testified at the hearing.

The social worker testified as an expert in risk assessment, placement, and reunification of dependent children.  She confirmed that father was asked to leave his parent orientation class because "he was disruptive and inappropriate in the classroom." He did complete a basic parenting class, however.

Regarding visitation, the social worker testified she had allowed a joint visitation with mother and father the week before, although all their prior visits were separate.  She did so because mother and father had been living together since mother's release from jail and there had been no domestic violence incidents during that time.  The social worker said that, though father needed redirection on how to hold and feed the baby during his initial visits, he no longer needs that assistance and has "made a lot of improvement."

5

She had not allowed unsupervised visits with father because "he's unpredictable, and I don't have a trusting relationship with him."

The social worker testified she remained opposed to releasing child to either of the parents because they "have significant mental health issues." She had initially recommended continuing, rather than terminating, family maintenance services because she mistakenly believed the 12-month review hearing would be held in July or August of 2015, rather than March. Although she thought there was a substantial probability child could be returned with six more months of services, the social worker did not believe there was such a probability of return with only two more months of services. In six months, the social worker believed "mother would have stabilized on her medication. . . . The parents would be enrolled in individual therapy, and the father would form a trusting relationship with his therapist."

The social worker testified that she explained to mother and father her recommendation that additional family maintenance services be terminated. Mother was "very quiet[,] . . . but . . . father was very upset. He said he was saddened. He raised his voice and was explaining to the mother in a shouting voice. He was shouting at her." When asked if she was surprised that father was "upset" at the change in her recommendation, the social worker said she was not. She explained, "I'm very aware of [*sic*] the father is usually upset with me. He gets easily upset." The social worker described a recent voicemail father left for her in which he was yelling because he was "upset . . . mother might be pregnant again."

Father submitted letters of recommendation from certain individuals who had employed him as a handyman, along with his own written declaration. Father also testified in his own behalf. He began by apologizing for his "abrupt behavior" such as when he "stormed out of the court room, and . . . interrupted the judge on two or three separate occasions." Father explained he was frustrated.

6

Father continued he had learned a lot in his domestic violence class and said that his relationship with mother had been free of domestic violence for approximately a year. Previously, "things [flew] across the room, and, . . . [he] got slapped a few times." Father did not know what prompted mother's assaults, but said he thought it was her schizophrenia. Though he was aware of her mental health issues, he perceived himself as having "in-depth personal knowledge of what makes her tick" and thinks she would be "an asset and not a liability" in terms of raising their child.

Father further testified he did not think the Department was helping him and mother. "They're [*sic*] given me a lot of phone numbers" but no one has gone out to where he and mother are living. When asked if he had ever raised his voice at a social worker, he said he did not recall, "but it's a distinct possibility."

After taking the matter under submission, the juvenile court found that reasonable services had not been provided to mother and that her reunification services would be continued. As to father, the juvenile court adopted the Department's recommendation and terminated his reunification services. The court stated father is "still unable to demonstrate insight into his own mental health needs and issues. . . . [H]e has difficulty with flexibility and building and maintaining relationships with professionals in providing care for [child]. The Court has personally observed his erratic and explosive behavior, and although the Court has seen progress, it is evident that he is unable to consistently regulate his own emotions to the detriment of [child], which is the basis that the Court is unable to return the child to his care at this time. [¶] With respect to [father], the Court does find that reasonable services were provided or offered to him, and in making those findings the Court terminates services for the father."

In a subsequent written order, filed May 7, 2015, the juvenile court memorialized its findings from the six-month review hearing, as follows: "Return of the child to the father would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child[; and] [b]y clear and convincing evidence, the father

7

has failed to make substantive progress in the court-ordered treatment plan and there is no substantial probability that the child will be returned to him by the twelve-month review."

## II.     DISCUSSION

### A.     Applicable legal principles and standard of review

"When a child is removed from a parent's custody, the juvenile court ordinarily must order child welfare services for the minor and the parent for the purpose of facilitating reunification of the family. (§ 361.5, subd. (a).) For a child under three years of age at the time of removal . . . reunification services are presumptively limited to six months. (§ 361.5, subd. (a)(2).)" (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843 (*Tonya M.*).)

"The dependency scheme sets up three distinct periods and three corresponding distinct escalating standards for the provision of reunification services to parents of children under the age of three. During the first period, which runs from roughly the jurisdictional hearing (§ 355) to the six-month review hearing (§ 366.21, subd. (e)), services are afforded essentially as a matter of right (§ 361.5, subd. (a)) . . . (§ 361.5, subd. (b))." (*Tonya M.*, *supra*, 42 Cal.4th at p. 845, fn. omitted.)

"During the second period, which runs from the six-month review hearing to the 12-month review hearing (§ 366.21, subd. (f)), a heightened showing is required to continue services. So long as reasonable services have in fact been provided, the juvenile court must find 'a substantial probability' that the child may be safely returned to the parent within six months in order to continue services. (§ 366.21, subd. (e).)" (*Tonya M.*, *supra*, 42 Cal.4th at p. 845.)

However, if, as here, reunification services have been provided to both parents, the court is authorized to terminate services to one parent and continue services to the other parent without scheduling a permanency planning hearing. (*In re Alanna A.* (2005) 135 Cal.App.4th 555, 565-566; *In re Jesse W.* (2007) 157 Cal.App.4th 49, 59-60.)

8

In determining whether to continue reunification services at the six-month review hearing, the juvenile court considers only the probable developments in the period for which services can be ordered, i.e., if at most four months remain until the 12-month review hearing, then the court should only consider what the impact of those four months of services would be on the parent and child. (*Tonya M.*, *supra*, 42 Cal.4th at p. 846.)

On appeal, the applicable standard of review is sufficiency of the evidence. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688.) "In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the [Department]. We must indulge in all legitimate and reasonable inferences to uphold the [juvenile court's findings]. If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545; *In re Monica C.* (1995) 31 Cal.App.4th 296, 306.) "We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)

B.     *Analysis*

1.     *The juvenile court applied the appropriate standard of proof*

Father initially argues the juvenile court "never made any findings by clear and convincing evidence on the record as required by [section 366.21, subdivision (e)]." This is untrue. The court's May 7, 2015 order states: "*By clear and convincing evidence*, the father has failed to make substantive progress in the court-ordered treatment plan and there is no substantial probability that the child will be returned to him by the twelve-month review." (Italics added.) While the juvenile court may not have uttered the words "by clear and convincing evidence" at the hearing where it orally pronounced its decision, those words do appear in the written order. The juvenile court applied the appropriate standard of proof in making its findings.

9

### 2. *Substantial evidence supports the juvenile court's findings*

Father makes several statutory interpretation arguments regarding the meaning of "regular participation" and "substantive progress" in the court-treatment plan, and he maintains that there was insufficient evidence to support the finding that he failed to make substantive progress to warrant termination. We disagree.

Although father can point to some progress and improvement, his "substantive progress" cannot be viewed in isolation and must be considered in light of the potential time for which services could be continued (i.e., the limited time period until the 12-month review hearing). Father was asked to leave his parent orientation class because of his disruptive behavior and there is nothing in the record to indicate that he ever completed that portion of his case plan. The social worker testified that father was usually upset with her and "gets easily upset." When she advised mother and father about the change in recommendations for the six-month review hearing (i.e., from continuing reunification services to terminating reunification services for both parents), he became "upset," said he "was saddened" and then was "shouting at" mother as he explained to her the changed recommendations. The social worker also testified about a recent voicemail message from father where he was yelling and upset because he thought mother may not have been taking her birth control medication and might be pregnant again.

Father's mental health issues (i.e., explosive and erratic behavior), though perhaps somewhat improved from the initial jurisdictional/dispositional hearing, continued to be significant. Consequently, there was substantial evidence to support a finding he failed to make sufficient "substantive progress" to warrant continuing services.

## III. DISPOSITION

The order terminating reunification services for father is affirmed.

_____
Premo, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Márquez, J.