Filed 6/21/24  I.M. v. Superior Court CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| I.M. et al.,<br><br>Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>Respondent,<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Real Party in Interest. | B333114<br><br>(Los Angeles County Super. Ct. No. 21CCJP00354 A - B) |

ORIGINAL PROCEEDING; petition for extraordinary writ. Superior Court of Los Angeles County, Mary E. Kelly, Judge. Petition denied.

Dominika Campbell, Tzivia Bowman, Law Office of Amy Einstein, for Petitioner I.M.

Melissa A. Chaitin, Law Office of Emily Berger, for Petitioner T.B.

No appearance for Respondent.

Dawn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Kimberly Roura, Senior Deputy County Counsel, for Real Party in Interest.

_____

## I.    INTRODUCTION

In this petition for extraordinary writ, petitioner I.M. (father) contends the Department of Children and Family Services (DCFS or the Department) failed to provide him with reasonable services and failed to communicate with him and service providers in order to help him reunify with his 15-year-old daughter, B.M.  In light of father's incarceration in Colorado, which limited his access to services, the Department's ability to provide services, and father's ability to establish and build a relationship with B.M., we conclude substantial evidence supports the dependency court's conclusion that reasonable services were provided to father and that the Department's communications with father were reasonable.

## II.  BACKGROUND

A.   *January 2021 to January 2022*

B.M. was detained from mother on January 21, 2021, after B.M.'s half-sibling A.B. tested positive for amphetamines and marijuana at birth.  On January 25, 2021, DCFS filed a petition pursuant to Welfare and Institutions Code section 300[1]alleging B.M. and A.B. were at risk due to substance abuse by mother, substance abuse by A.B.'s father A.W. (stepfather), and domestic violence between mother and stepfather.  At the detention hearing on January 28, 2021, the dependency court found father to be B.M.'s presumed father and detained B.M. from her parents.  DCFS was ordered to conduct a due diligence search for father, whose whereabouts were unknown at the time.

On March 10, 2021, a social worker asked mother for father's contact information.  Mother reported father's full name and date of birth, but said she did not have father's contact information or know his Facebook profile name.  On March 15, 2021, B.M. told the social worker she only knew father's first name and had not spoken to him since 2019, when father was in Colorado.  B.M. said mother and father only contacted each other through Facebook Messenger.

On March 15 and 17, 2021, the social worker called two possible phone numbers for father that had been provided by

[1]All further statutory references are to the Welfare and Institutions Code.

mother and maternal grandmother (MGM). One phone number was disconnected. No one answered the second phone number, and the social worker left a message. After running searches on California child welfare and criminal databases and a Colorado incarceration database, the social worker submitted a due diligence report on March 23, 2021 indicating father's whereabouts remained unknown.

The dependency court deemed due diligence complete as to father on November 22, 2021. At the January 7, 2022 adjudication hearing, the dependency court sustained the section 300 petition with amendments, removed B.M. from parental custody, and granted mother reunification services. Father was denied reunification services under section 361.5, subdivision (b)(1) because his whereabouts were unknown.

B.    *June 2022 to October 2022*

In anticipation of the six-month review hearing, DCFS conducted a further due diligence search in June 2022 and located father, who was incarcerated in Denver. At the time, his estimated parole eligibility date was May 1, 2022, his next parole hearing date was August 2022, and his mandatory release date was July 16, 2024.

DCFS sent father notice of the dependency proceedings on June 16, 2022, and father made his first appearance in the case on August 25, 2022. The dependency court ordered DCFS to make best efforts to schedule calls between father and B.M.

4

On his parentage form, father reported B.M. had lived with him from birth in 2009 until 2010, when mother and B.M. moved from Colorado to California. Thereafter, father and B.M. communicated through phone calls and social media messaging "until [they] lost contact a few years ago." He reported he had provided financial assistance to B.M. through child support. When asked her opinion about father having custody of B.M., mother said father never had a relationship with B.M. and that B.M.'s parental relationship was with stepfather.

On August 26, 2022, father filed a section 388 petition seeking reunification services now that his whereabouts had become known. In advance of the hearing on the petition, a social worker interviewed father on September 30, 2022. Father reported he last saw B.M. when she was one-and-a-half years old and last talked to her on the telephone three years ago. He told the social worker he would be released to a halfway house under an intensive supervision parole program on October 5, 2022 and said he would do "whatever it takes" to have B.M in his life. A case manager at the prison confirmed father would be released on October 5, 2022 to a halfway house, where he would have access to numerous programs. For her part, B.M. told a social worker she was not interested in living with father or having any contact with him because she "doesn't know" him.

During a Child and Family Team meeting on March 16, 2021, a Multidisciplinary Assessment Team assessor indicated B.M. would be referred to mental health services. However, in June 2022, DCFS reported B.M. had refused to participate in individual counseling because she did not perceive any problems and was able to talk openly with her foster family and aunts.

Nonetheless, a social worker asked the foster family agency to provide B.M. with an updated counseling assessment.

At the October 6, 2022 hearing on father's section 388 petition, the dependency court granted father reunification services. DCFS recommended a case plan that included a parenting course, individual counseling, a substance abuse program with random testing, virtual conjoint counseling with B.M. at her discretion, virtual or telephonic contact, and monitored in-person visits, with all contact between father and B.M. to be at B.M.'s discretion. The parties agree the court signed the proposed case plan, although the plan itself does not appear in the record.

C.     *October 2022 to June 2023*

Father was placed on supervised release on October 5, 2022. However, in a status report dated January 30, 2023, DCFS reported father had returned to state prison. On January 25, 2023, DCFS provided father with Colorado community resources, the Colorado 211 Resource Line, and prison phone list instructions. No visitation was scheduled between father and B.M. because B.M. was not interested in having any contact with him.

In a report dated January 30, 2023, DCFS reported B.M. continued to refuse counseling services. Although the social worker encouraged her, B.M. said she did not need counseling. Shortly thereafter, on February 15, 2023, B.M. said she would "start with telephone [calls]" with father for "now." Also on

6

February 15, 2023, the social worker received an email reply from father's case manager, who said virtual video visits for father and B.M. would require an application to, and approval by, the prison visiting department. On February 27, 2023, a social worker submitted a counseling referral for B.M. and B.M. enrolled in counseling services.

At a 12-month review hearing held on March 7, 2023, the dependency court found father's progress on the case plan to be "unsubstantial" but nonetheless continued father's reunification services due to barriers posed by his incarceration. The court signed a corrected case plan for father, which included a full drug/alcohol program, weekly random drug testing, a 12-step program, conjoint counseling when deemed appropriate by B.M.'s therapist, parenting classes, and individual counseling. It also ordered DCFS to provide father with a photo of B.M. and a phone visitation schedule for weekly calls with B.M. The first three phone calls were to be monitored, followed by unmonitored calls if appropriate.

On May 16, 2023, father told a social worker he would be attending Peer Recovery Coach Class starting June 1, 2023. He also expressed interest in Narcotics Anonymous/Alcoholics Anonymous meetings, motivational classes, and a business class so he could learn how to create a business plan. He reported he was "learning to find his triggers regarding drug use, triggers in the street, [and] selling dope."

B.M. and father scheduled weekly calls and B.M. spoke to father on March 7, 2023. However, DCFS reported that as of the week of June 5, 2023, father was calling B.M. every other day.

7

According to B.M., their calls last about ten minutes each. They talk about father's plans after his release and father asks about her school. Once, father mentioned B.M. has a 10-year-old half-sibling, but B.M. said, "I don't know who she is and I'm not comfortable speaking with you."

D.    *July 2023 to October 2023*

In anticipation of a July 12, 2023, 18-month review hearing, DCFS filed a report recommending continuation of family reunification services for father. On the day of the hearing, DCFS changed its recommendation and asked the dependency court to terminate reunification services because the parents "have either been unable to comply with Court-ordered treatment services due to incarceration(s) and/or the parents have been inconsistent with evidencing compliance in their respective Court-ordered treatment programs." Because of the change in recommendation, the 18-month review hearing was continued to August 11, 2023 to allow DCFS to provide notice to the parties.

In last minute information filed August 10 and 11, 2023, DCFS reported a social worker had spoken with B.M.'s therapist and asked the therapist to address permanency, family dynamics, and relationships in therapy. However, on July 14, 2023, B.M. told a social worker she was not comfortable with father and only wanted to talk to him once a week for a few minutes. B.M. said, "I don't even know who he is" and "I am okay to speak to him once in a while but I don't want to talk to him all the time" or "every

8

time." DCFS also noted father had been in prison throughout the case and has reported "no involved services outside of peer support."

On August 11, 2023, the dependency court again continued the 18-month review hearing to September 14, 2023, after finding DCFS had not provided adequate notice to the parents. It also ordered DCFS to help father schedule additional phone calls with B.M. beyond the weekly telephone call. In a last-minute information filed August 31, 2023, DCFS reported B.M. continues to have phone calls with father but also continues to express no interest in having additional contact with father or his relatives. In addition, B.M. was receiving counseling and reported therapy was going well. On August 18, 2023, B.M. and her caregiver agreed B.M. should start receiving wraparound services and a wraparound referral was submitted for her.

On September 14, 2023, the hearing was continued yet again to October 5, 2023. The dependency court again ordered DCFS to assist father in setting up monitored phone calls with B.M. The hearing was later continued to October 9, 2023 and again to October 20, 2023.

In the meantime, father submitted certificates for programs he completed during incarceration: "Moral Reconation Therapy" on August 1, 2023; "Starting Your Business" on June 12, 2023; and "Defining Your Standard" on November 22, 2022. At the September 14, 2023 hearing, father's counsel acknowledged none of the certificates submitted by father related to father's case plan. An October 3, 2023 letter from Fit 4 Recovery's director stated father had developed an "Individual Success Plan" and was enrolled in a 10-to-12 week parenting course, to be followed

by substance abuse therapy and mental health support. Based on the letter, it appeared father was released from incarceration sometime before October 3, 2023.

In a last-minute information filed October 4, 2023, DCFS reported a social worker made four attempts between September 22 and October 2, 2023 to set up virtual visits between father and B.M. Each time, the prison staff or case manager directed the social worker to someone else. As of October 4, 2023, the social worker had not yet heard back from the last person for whom she had left a message. B.M. indicated she was available for phone calls only once a week because of her extracurricular activities and because she did not want any additional contact with father.

On October 19, 2023, DCFS reported it had made efforts to facilitate contact between B.M. and a paternal aunt, but B.M. said she "is not comfortable meeting anyone" as "she is not even familiar with her own father let alone anyone from his side" and paternal aunt, for her part, had not provided the introductory letter to B.M. that the social worker had asked paternal aunt to write.

E.    *The October 20, 2023 Hearing*

At the 18-month review hearing on October 20, 2023, father's counsel argued DCFS did not provide reasonable reunification services. Counsel noted father had limited access to programs due to his incarceration and lacked an established relationship with B.M. She believed DCFS should have set up conjoint counseling and maintained regular contact with father

about his program participation.  Counsel also noted father was recently released from incarceration and asked the court to continue services for father, whose reunification period was shorter because he was not located early in the case.

Counsel for DCFS and B.M. both asked the dependency court to terminate reunification services.  B.M.'s counsel noted father had not maintained a relationship with B.M. throughout her life, well before his recent incarceration, and when located, he was already a stranger to B.M.  Counsel argued reunification services are typically offered for only six months when they are granted following a section 388 petition and father had a full year of services.  Counsel for DCFS also emphasized that 33 months had passed since B.M. was detained in January 2021.

The dependency court took the matter under submission and made its ruling at a subsequent, October 31, 2023, hearing. It acknowledged father's concerns about the reasonableness of the services offered, but found "the Department did what they could.  It's not as perfect as one would like, but he was late . . . to come to the child's life.  She considers him a stranger. . . . She's okay speaking with him on the phone, but she does not really know him.  And because of that it's — and because of her extracurricular activities, the visitation is one hour a week."

The court found the parents' progress to be "unsubstantial," terminated reunification services, and set the matter for a section 366.26 permanency planning hearing.  Father filed this petition for extraordinary writ challenging the termination of reunification services on January 5, 2024 and mother filed a joinder on February 9, 2024.  DCFS filed an answer, which counsel for B.M. joined.  We now deny the petition.

11

# III. DISCUSSION

A. *Legal Principles and Standard of Review*

"[W]henever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians." (§ 361.5, subd. (a)(1).) "Each reunification plan must be appropriate to the particular individual and based on the unique facts of that individual. [Citations.]" (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)

"In determining the content of reasonable services, the court shall consider the particular barriers to an incarcerated, institutionalized, detained, or deported parent's access to those court-mandated services and ability to maintain contact with the child, and shall document this information in the child's case plan." (§ 361.5, subd. (e)(1).) Services can include maintaining contact between the parent and child through collect telephone calls, and transportation and visitation services as appropriate. (§ 361.5, subd. (e)(1)(B) – (C).) "An incarcerated or detained parent may be required to attend counseling, parenting classes, or vocational training programs as part of the reunification service plan if actual access to these services is provided. The social worker shall document in the child's case plan the particular barriers to an incarcerated, institutionalized, or detained parent's access to those court-mandated services and ability to maintain contact with the child." (§ 361.5, subd.

12

(e)(1)(D)(ii).)  Reunification services to an incarcerated parent are subject to the 18-month limitation imposed in section 361.5, subdivision (a)(3)(A).  (§ 361.5, subd. (e)(1); *In re Monica C.* (1995) 31 Cal.App.4th 296, 305–06.)

"In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the respondent.  We must indulge in all legitimate and reasonable inferences to uphold the verdict.  If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed.  [Citations.]"  (*Misako R.*, *supra,* 2 Cal.App.4th at p. 545.)

However, there must be "clear and convincing evidence" that such services were offered to the parents before the court may set the matter for a permanency planning hearing under section 366.26.  (§ 366.21, subd. (g)(1)(c)(ii); *In re Monica C., supra*, 31 Cal.App.4th at p. 306.)  When reviewing findings that must be proved by clear and convincing evidence, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–12.)

B.      *Reasonable Services*

We conclude substantial evidence supports the dependency court's finding that DCFS provided father with reasonable reunification services in light of the constraints posed by father's incarceration in a different state.  Although B.M. initially refused all visitation with father, she later changed her mind and agreed to phone calls.  Thereafter, DCFS set up weekly calls beginning on March 7, 2023.  By early June 2023, DCFS was reporting that father was calling B.M. every other day.  Weekly calls apparently continued throughout the reunification period.  Despite seven months of consistent calls, B.M. continued to insist she did not want more contact with father because she barely knew him.

In addition, father's access to programs was limited due to his incarceration.  Although his case manager reported father would have access to numerous programs after his release to a halfway house on October 5, 2022, father appears to have been unsuccessful on supervised release; he returned to state prison shortly after his release and was not able to take advantage of those programs.  To the extent father completed programs in prison, those programs were unrelated to his reunification case plan.

### 1.    Conjoint Therapy

Father contends DCFS failed to promptly enroll B.M. in individual therapy and, after she was enrolled, failed to inquire with her therapist about the appropriateness of conjoint counseling.  He relies on *In re Alvin R.* (2003) 108 Cal.App.4th 962 (*Alvin R.*), where the court of appeal wrote, "Visitation is an essential component of any reunification plan.  [Citation.]  To promote reunification, visitation must be as frequent as possible. [Citation.] Where the minor is reluctant to visit, and family therapy is needed to promote visitation, such therapy may be critical to reunification." (*Id.* at p. 972.)  In *Alvin R.*, it took three months to get the child into individual therapy because of scheduling conflicts and the caregiver's desire to find a therapist near her home.  As a result, conjoint therapy had not yet begun at the time of the contested 12-month review hearing.  (*Id.* at p. 968-969.)  The reviewing court found the Department did not make sufficient efforts to begin individual therapy earlier, noting father had "done all that was required of him under the plan" and therefore, just one service — getting the child into enough sessions of individual therapy — stood in the way of the remainder of the reunification plan.  (*Ibid.*)

We do not find *Alvin R.* analogous.  "The adequacy of reunification plans and the reasonableness of DCFS's efforts are judged according to the circumstances of each case." (*Armando L. v. Superior Court* (1995) 36 Cal.App.4th 549, 554.)  In *Alvin R.*, not only was delay in individual counseling the primary obstacle to visitation and eventual reunification, but the obstacles to counseling were logistical and solvable by DCFS.  As the court

15

noted, DCFS could have identified other therapists in the area or tried to find transportation so the child could see a therapist further away. (*Alvin R., supra*, 108 Cal.App.4th at p. 973.)

In our case, the primary obstacle to in-person visitation was father's incarceration in Colorado, not the lack of individual or conjoint counseling. In addition, B.M. agreed to telephone visitation voluntarily and had weekly phone calls with father for seven months before reunification services were terminated. Ultimately, father's difficulties in establishing a relationship with B.M. had more to do with his long and continued physical absence from her life. Father's attempts at restoring the relationship did not begin until B.M. was 14 years old — some 13 years after father last saw B.M. and more than three years after he last spoke to her by telephone.

There are other, critical differences between this case and *Alvin R.* Unlike in *Alvin R.*, it is not clear what more DCFS could have done to enroll B.M. in individual therapy earlier. B.M. refused individual therapy for over two years, even after social workers tried to persuade her otherwise and requested counseling assessments for her. And, notably, father in *Alvin R.* did everything else that was required of him under his case plan. He completed a parenting course and reported he had implemented the techniques he learned with his other children, who adored him. (*Alvin R., supra,* 108 Cal.App.4th at p. 970.) Here, father had not completed any programs relevant to his case plan and the dependency court found father's progress on the case plan to be "unsubstantial" — a finding father does not contest.

## 2. Reasonable Communications

Father also contends the Department failed to maintain reasonable communications with him or his service providers and did not ask father or his case managers about the programs he had enrolled in or completed. DCFS' communications with father were far from robust. However, "in reviewing the reasonableness of the reunification services provided by the Department, we must also recognize that in most cases more services might have been provided, and the services which are provided are often imperfect. The standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.) We conclude DCFS' contacts with father were reasonable and adequate under the circumstances.

On October 5, 2022, one day before the dependency court granted father reunification services, a social worker emailed father's case manager and asked for "all of the available services/programs to inmates and what [father] is actually enrolled in and completed." The case manager responded that father was assigned to the Wild Horse Program but said she did not know what programs would be available to father there.

The record shows no further contact between DCFS and father until January 25, 2023. However, it also appears father was unsuccessful at the halfway house, where he would have had access to numerous programs, and had returned to prison by January 2023. DCFS and father were in contact by mail and telephone multiple times in January, February, and March 2023. A social worker provided father with resources, discussed the

17

case plan with him, and made arrangements for him to have weekly calls with B.M. As a result of those efforts, weekly telephone visitation began on March 7, 2023.

Two months later, on May 16, 2023, a social worker talked to father again, and father reported he was starting Peer Recovery Coach class on June 1, 2023. Father completed two other courses in June and August 2023, but neither were related to his case plan. In September and October 2023, after the dependency court ordered DCFS to help father schedule additional phone calls beyond the weekly call, DCFS made multiple efforts to set up virtual visits between father and B.M. These efforts appeared unsuccessful. Based on an October 3, 2023 letter from Fit 4 Recovery, it appears father may have been released from prison sometime before October 3, 2023.

There are undoubtedly gaps in DCFS' communication with father. However, the record shows DCFS made numerous contacts with father to establish visitation so that father could try to build a relationship with B.M. It also shows DCFS advised father of the case plan, what he needed to do, and asked for updates about his progress. In the end, it was father's "confine[ment] . . . in a distant, out-of-state prison" that "placed him[] out of the reach of any meaningful rehabilitative services which the Department could have provided." (*Elijah R. v. Superior Court, supra*, 66 Cal.App.4th at p. 971.) Under these circumstances, we believe DCFS' contacts with father were reasonable and adequate.

## IV.   DISPOSITION

The petition for extraordinary writ is denied.

NOT TO BE PUBLISHED.

MOOR, J.

WE CONCUR:

BAKER, Acting P. J.                    LEE, J.*

---

\*      Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.